USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 94-2138 WILFREDO MARTINEZ, a/k/a WILFREDO MARTINEZ RODRIGUEZ, Plaintiff, Appellant, v. RAFAEL COLON, a/k/a RAFAEL COLON PIZARRO, ET AL., Defendants, Appellees. __________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Raymond L. Acosta, U.S. District Judge] ___________________ __________________________ Before Torruella, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Selya, Circuit Judge. _____________ __________________________ John E. Mudd, with whom Howard Charles and Ortiz Toro & _____________ ______________ _____________ Ortiz Brunet Law Offices were on brief, for appellant. ________________________ Edgardo Rodriguez-Quilichini, Assistant Solicitor General, _____________________________ with whom Pedro Delgado Hernandez, Solicitor General, and Carlos ________________________ ______ Lugo Fiol, Deputy Solicitor General, were on brief, for __________ appellees. _________________________ May 31, 1995 _________________________ SELYA, Circuit Judge. This appeal raises interesting SELYA, Circuit Judge. ______________ questions about the contours of 42 U.S.C. 1983 (1988) and the reach of the Supreme Court's core holding in DeShaney v. ________ Winnebago County Social Servs. Dep't, 489 U.S. 189 (1989). ________________________________________ Concluding, as we do, that the court below appropriately applied DeShaney, we affirm the entry of summary judgment in the ________ defendants' favor. I. BACKGROUND I. BACKGROUND Consistent with the method of Fed. R. Civ. P. 56, we canvass the material facts in a light that flatters, but does not impermissibly distort, the plaintiff's claims. We then recount the travel of the case. A. The Facts. A. The Facts. _________ We outline the facts, omitting the graphic details on which our dissenting brother prefers to dwell. In our view, these details are not relevant to the legal issues posed on appeal. In the early morning hours of May 26, 1988, plaintiff- appellant Wilfredo Martinez Rodriguez (Martinez), a youthful member of Puerto Rico's police force, drove to the Loiza Street Precinct, located in the San Juan metropolitan area. Though Martinez was not scheduled to begin his shift until 4:00 a.m., he arrived early, pursuant to local custom, in order to procure his post assignment. Martinez alleges that he was on duty from the moment he arrived even before his shift began because from that point forward he was subject to the shift commander's 2 orders. Upon Martinez' arrival, a fellow officer who was on duty at the time, Angel Valentin Corali (Valentin), approached Martinez' car and called him "pretty boy" ("papito lindo"). When Martinez alighted, Valentin drew his service revolver, pointed it at Martinez' stomach, cocked the hammer, placed his finger on the trigger, and inquired if Martinez was afraid. Valentin then disarmed the weapon, and Martinez hurried inside the station, first telling Valentin: "Don't horse around with that because you will kill me." Shortly after this fracas had occurred, Valentin accosted Martinez in the radio room, inserted his finger into a small hole in Martinez' undershirt, and ripped it. Once again, Martinez walked away from Valentin. He then changed into his uniform, entered the waiting room, and reported to his shift supervisor, defendant-appellee Juan Trinidad Marrero (Trinidad). Soon thereafter, Valentin reappeared, pointed his revolver at Martinez' genitals, cocked the hammer, and, with his finger on the trigger, threatened to "blow away" Martinez' penis (asking him, somewhat rhetorically, if he was scared). When Valentin lowered the weapon, Martinez immediately moved away from him. Within minutes Valentin again approached Martinez, cocked the revolver, aimed it at Martinez' groin, and resumed his taunting. The revolver accidentally discharged, maiming Martinez. The first encounter took place in the precinct's 3 parking lot and the rest transpired inside the police station. According to Martinez, roughly twenty minutes elapsed from start to finish. All parties agree that the shooting, which occurred before the 4:00 a.m. shift change, was unintentional.1 B. Travel of the Case. B. Travel of the Case. __________________ On May 22, 1989, Martinez filed suit in federal district court against numerous defendants, including, as relevant here, Rafael Colon Pizarro (Colon), Luis A. Velez Rentas (Velez), and Trinidad (collectively, "the officers" or "the defendants").2 Invoking 42 U.S.C. 1983 and premising jurisdiction on the existence of a federal question, see 28 ___ U.S.C. 1331 (1988), he alleged that his rights had been abridged in that each defendant owed him a duty to intervene and protect him from readily discernible harm at the hands of a fellow officer, but each defendant breached this duty by subsequent inaction.3 Martinez asserted pendent tort claims with respect to all three defendants and, with respect to  ____________________ 1In his memorandum of law in support of his opposition to defendant Carlos Lopez-Feliciano's motion to dismiss, Martinez stated that "the revolver apparently fired by accident." Record Appendix at 21. At any rate, the summary judgment record contains no facts that would support a contrary finding; and, for aught that appears, Martinez has never asserted that Valentin shot him intentionally. 2Plaintiff asserted claims against several other defendants, including Valentin and Lopez-Feliciano. Those claims are not before us, and we ignore them for purposes of this opinion. 3Although the underlying facts are hotly contested, we assume for purposes of this appeal, as Martinez would have it, that all three defendants witnessed the entire progression of events and had a meaningful opportunity to intervene at each step along the way. 4 Trinidad, asserted a section 1983 claim based on supervisory liability. After a flurry of pretrial discovery, the officers moved for summary judgment. They argued, inter alia, that _____ ____ Valentin was not acting under color of state law when the mishap occurred; and that, therefore, onlooker officers did not have a constitutional duty to intervene on Martinez' behalf. The district court referred the motions and Martinez' timely opposition to a magistrate judge. The magistrate concluded that, under DeShaney, the officers had no constitutional obligation to ________ protect Martinez from Valentin's actions, and urged the district court to grant summary judgment. The plaintiff objected to the magistrate's report and recommendation, but the district court, affording de novo review, see Fed. R. Civ. P. 72(b), adopted the __ ____ ___ report, accepted the recommendation, and entered judgment accordingly. This appeal followed. II. THE SUMMARY JUDGMENT STANDARD II. THE SUMMARY JUDGMENT STANDARD A district court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We have charted the boundaries of this rule in case after case, see, e.g., Coyne v. Taber Partners I, ___ ____ _____ _________________ ___ F.3d ___, ___ (1st Cir. 1995) [No. 94-2231, slip op. at 4-5]; National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 _________________________ _______________ 5 (1st Cir. 1995), petition for cert. filed, 63 U.S.L.W. 3736 (U.S. ________ ___ _____ _____ Apr. 4, 1995) (No. 94-1630); Vasapolli v. Rostoff, 39 F.3d 27, 32 _________ _______ (1st Cir. 1994); Dow v. United Bhd. of Carpenters, 1 F.3d 56, 58 ___ __________________________ (1st Cir. 1993); Pagano v. Frank, 983 F.2d 343, 347 (1st Cir. ______ _____ 1993); Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 793-94 _____ _________________________ (1st Cir. 1992), cert. denied, 113 S. Ct. 1845 (1993); United _____ ______ ______ States v. One Parcel of Real Property (Great Harbor Neck, New ______ _____________________________ ________________________ Shoreham, R.I.), 960 F.2d 200, 204 (1st Cir. 1992); Rivera- ______________ _______ Muriente v. Agosto-Alicea, 959 F.2d 349, 351-52 (1st Cir. 1992); ________ _____________ Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 7-8 (1st ____________ __________________________ Cir. 1990); Garside v. Osco Drug, Inc., 895 F.2d 46, 48-49 (1st _______ _______________ Cir. 1990); Brennan v. Hendrigan, 888 F.2d 189, 191-92 (1st Cir. _______ _________ 1989), and it would serve no useful purpose to draw that map anew. For present purposes, we need say no more than that summary judgment will lie if the record, even when taken in the aspect most favorable to the nonmovant, see Rivera-Muriente, 959 ___ _______________ F.2d at 352, fails to yield a trialworthy issue as to some material fact. In applying this principle, it is important to bear in mind that not every genuine factual conflict necessitates a trial. It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared. See One Parcel, 960 F.2d at 204. Here, the record ___ ___________ reflects a veritable salmagundi of bitterly disputed facts but none that is material. 6 To that extent, then, our task is simplified. Exercising de novo review, see Pagano, 983 F.2d at 347, and __ ____ ___ ______ adopting the plaintiff's version of all controverted facts (but not, however, giving credence to "conclusory allegations, improbable inferences, [or] unsupported speculation," Medina- _______ Munoz, 896 F.2d at 8), we conclude that the court below did not _____ err in jettisoning the section 1983 claims. III. ANALYSIS III. ANALYSIS There are two essential elements of an action under section 1983: "(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." Chongris v. Board of Appeals, 811 F.2d 36, ________ _________________ 40 (1st Cir.), cert. denied, 483 U.S. 1021 (1987); accord West v. _____ ______ ______ ____ Atkins, 487 U.S. 42, 48 (1988); Daniels v. Williams, 474 U.S. ______ _______ ________ 327, 330-31 (1986). Of course, the reference to "state law" cannot be taken literally, for Puerto Rico enjoys the functional equivalent of statehood in regard to section 1983 and, thus, state law includes Puerto Rico law. See Playboy Enters., Inc. v. ___ _____________________ Public Serv. Comm'n of P.R., 906 F.2d 25, 31 n.8 (1st Cir.), _____________________________ cert. denied, 498 U.S. 959 (1990); Berrios v. Inter Am. Univ., _____ ______ _______ _______________ 535 F.2d 1330, 1331 n.3 (1st Cir.), appeal dismissed, 426 U.S. ______ _________ 942 (1976). For purposes of this appeal, the defendants do not contest the plaintiff's allegation that, at all relevant times, the defendants were on duty and acting under color of state law. 7 This concession reduces our inquiry to whether the facts, taken most congenially to the plaintiff, can support a finding that the defendants violated a right secured to the plaintiff either by the Constitution or by federal law. Since the plaintiff has not alleged the transgression of any right secured to him under a federal statute, we may narrow the inquiry still further, limiting it to whether the facts show a violation of a constitutional right. It is to this elusive question that we next proceed. A. The Duty to Intervene. A. The Duty to Intervene. _____________________ Plaintiff pins his hopes principally on a claim that the defendants' failure to protect him from the imminent peril posed by Valentin abridged his right to substantive due process. The touchstone of the law in this area is the Supreme Court's opinion in DeShaney. There, a child sued for damages under 42 ________ U.S.C. 1983, claiming that employees of a state-run social service agency, on notice of a parent's abusive behavior, nonetheless failed to protect the child from the readily foreseeable danger. See DeShaney, 489 U.S. at 193. The Court ___ ________ affirmed the entry of summary judgment in defendants' favor. Chief Justice Rehnquist, writing for the majority, explained that the Due Process Clause ordinarily does not require the state to protect an individual's life, limb, or property against the marauding of third parties not acting to the state's behoof. See ___ id. at 196. Consequently, "a State's failure to protect an ___ individual against private violence simply does not constitute a 8 violation of the Due Process Clause." Id. at 197. ___ Although the DeShaney Court left open the possibility ________ of certain circumscribed exceptions to the general rule of nonliability, Martinez makes no effort to slide within them. He does not argue that he was in the custody of the state, see id. ___ ___ at 198-200 (discussing right to protection arising in favor of incarcerated prisoners and involuntarily committed mental patients), or that he was in its "functional custody," see id. at ___ ___ 201 n.9 (discussing possible existence of situations analogous to incarceration or institutionalization), or that the state made him more vulnerable to Valentin's actions, see id. at 201. ___ ___ Rather, Martinez contends that DeShaney is altogether inapposite. ________ To the extent that this contention is based simply and solely on the fact that, unlike in DeShaney, the defendants here ________ are police officers, not social workers, we reject it. Of course, police officers sometimes have an affirmative duty to _________ intervene that is enforceable under the Due Process Clause. For example, "[a]n officer who is present at the scene [of an arrest] and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance," provided that he had a "realistic opportunity" to prevent the other officer's actions. Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n.3 (1st __________ ______________________ Cir. 1990), cert. denied, 500 U.S. 956 (1991); accord O'Neill v. _____ ______ ______ _______ Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988). But this line of __________ cases does not, as plaintiff importunes, carve out an exception 9 to the DeShaney rule. Instead, such cases escape the rule ________ because the aggressor is acting under color of his public office. Gaudreault illustrates the point. The quoted statement __________ specifically contemplates that the underlying tortious conduct take place within the context of an arrest, interrogation, or similar maneuver, see Gaudreault, 923 F.2d at 206-07 & n.3, in ___ __________ which a differential exists between the victim and the officer precisely because of the latter's status as one empowered to enforce the law, coercively if necessary, against the former. Similarly, O'Neill involved the beating of a handcuffed man by _______ law enforcement officers during an interrogation in the detention area of a police station. See O'Neill, 839 F.2d at 10. We ___ _______ cannot imagine a more paradigmatic exercise of state authority than the processes of handcuffing, detaining, and interrogating a citizen. Gaudreault and O'Neill, then, are cases in which the __________ _______ aggressor is acting under color of state law. The DeShaney rule ________ which addresses the "State's failure to protect an individual against private violence," DeShaney, 489 U.S. at 197 (emphasis _______ ________ supplied) is not implicated in such cases because the violence in question is not private but "public," i.e., attributable to ____ state action.4  ____________________ 4A constitutional duty to intervene may also arise if onlooker officers are instrumental in assisting the actual attacker to place the victim in a vulnerable position. See, ___ e.g., Byrd v. Brishke, 466 F.2d 6, 9-11 (7th Cir. 1972); cf. ____ ____ _______ ___ DeShaney, 489 U.S. at 201 (recognizing a possible affirmative ________ constitutional duty to protect against certain dangers if the state takes "part in their creation" or does something "to render [the victim] more vulnerable to them"). In such a scenario, the onlooker officers and the aggressor officer are essentially joint 10 Private violence even private violence engaged in by one who happens to work for the state has different legal ramifications than violence attributable to state action. See, ___ e.g., Hughes v. Halifax County Sch. Bd., 855 F.2d 183, 186-87 ____ ______ ________________________ (4th Cir. 1988) (distinguishing private actions of county maintenance workers from cases in which "the actions complained of were committed while the defendants were purporting to act under the authority vested in them by the state, or were otherwise made possible because of the privileges of their employment"), cert. denied, 488 U.S. 1042 (1989). _____ ______ Thus we recently held, in light of DeShaney, that a ________ district attorney's office had no constitutional obligation to protect a citizen against self-inflicted private violence (there, noncustodial suicide) alleged to have been caused by the state's implication of him in a multiple murder case. See Souza v. Pina, ___ _____ ____ ___ F.3d ___, ___ (1st Cir. 1995) [No. 94-2079, slip op. at 9- 11]. Interpreting DeShaney to say that the state has no ________ generalized duty to protect its citizens from violence except when it sets the stage by acting affirmatively (as in a custodial setting), see id. at ___ [slip op. at 9], we concluded that, ___ ___ although the state's acts may have "rendered [the decedent] more vulnerable to danger in the sense that those acts may have  ____________________ tortfeasors and, therefore, may incur shared constitutional responsibility. See generally Monroe v. Pape, 365 U.S. 167, 187 ___ _________ ______ ____ (1961) (advising courts to read section 1983 against the backdrop of historical tort liability). Because there is no indication of any such joint enterprise here, we have no occasion to explore the viability of the theory. 11 exacerbated or even brought about [the decedent's] suicidal tendencies . . . these are not the kind of `affirmative acts' by the state that would give rise to a constitutional duty to protect." Id. at ___ [slip op. at 10] (citing Monahan v. ___ _______ Dorchester Counseling Ctr., Inc., 961 F.2d 987, 992-93 (1st Cir. ________________________________ 1992)). Translated to the police milieu, these cases mean that when an on-duty police officer witnesses violence, the existence vel non of a constitutional duty to intervene will most often ___ ___ hinge on whether he is witnessing private violence or violence attributable to state action. It remains to be seen how and where the line that separates one from the other should be drawn. B. Private Action. B. Private Action. ______________ In attempting to distinguish private violence from violence attributable to state action for purposes of applying the DeShaney rule, courts must beware simplistic solutions. To ________ be sure, violence is attributable to state action if the perpetrator is acting under color of state law, see, e.g., ___ ____ Earnest v. Lowentritt, 690 F.2d 1198, 1200 (5th Cir. 1982) _______ __________ ("Section 1983 does not reach all constitutional injuries, but only those caused by persons acting `under color of state law.'"), but that is a virtual tautology. Furthermore, the construct "acting under color of state law" rarely depends on any single, easily determinable fact, such as a policeman's garb, see, e.g., Stengel v. Belcher, 522 F.2d 438, 441 (6th Cir. 1975) ___ ____ _______ _______ (explaining that whether a police officer is "in or out of 12 uniform is not controlling"), cert. dismissed, 429 U.S. 118 _____ _________ (1976), duty status, see, e.g., Pitchell v. Callan, 13 F.3d 545, ___ ____ ________ ______ 548 (2d Cir. 1994) (explaining that "whether an officer was on or off duty when the challenged incident occurred" is not dispositive); Stengel, 522 F.2d at 441 (same), or whereabouts, _______ see, e.g., Delcambre v. Delcambre, 635 F.2d 407, 408 (5th Cir. ___ ____ _________ _________ 1981) (per curiam) (holding that a police chief's assault on a private citizen was not conduct under color of law even though it occurred at police headquarters). Nor does "acting under color of state law" depend on whether an officer stays strictly within the line of duty, or oversteps it. See Monroe v. Pape, 365 U.S. ___ ______ ____ 167, 172 (1961); Screws v. United States, 325 U.S. 91, 111 ______ ______________ (1945). For instance, a police officer who exercises, but misuses or exceeds, his lawfully possessed authority is generally thought to be acting under color of law. See, e.g., Gibson v. ___ ____ ______ City of Chicago, 910 F.2d 1510, 1518 (7th Cir. 1990). _______________ The point is that segregating private action from state action calls for a more sophisticated analysis. In general, section 1983 is not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved in that way but for the authority of his office. Thus, whether a police officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties. See Pickrel v. City of Springfield, 45 F.3d ___ _______ ____________________ 13 1115, 1118 (7th Cir. 1995); Anthony v. County of Sacramento, 845 _______ ____________________ F. Supp. 1396, 1400 (E.D. Cal. 1994). We think this focus follows inexorably from West, where ____ the Court wrote that "[t]he traditional definition of acting under color of state law requires that the defendant . . . have exercised power `possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West, 487 U.S. at 49 (quoting United States v. ____ ______________ Classic, 313 U.S. 299, 326 (1941)). Hence, a person acts under _______ color of state law "when he abuses the position given to him by the State." Id. at 50. The key determinant is whether the ___ actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law. See id. ___ ___ Logically, then, not every action undertaken by a person who happens to be a police officer is attributable to the state. Though "under `color' of law means under `pretense' of law," even so, the acts of state officials "in the ambit of their personal pursuits" are not state action. Screws, 325 U.S. at ______ 111; see also Gibson, 910 F.2d at 1518. Accordingly, a ___ ____ ______ policeman's private conduct, outside the line of duty and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law. See Barna v. City of ___ _____ _______ Perth Amboy, 42 F.3d 809, 816 (3d Cir. 1994); United States v. ___________ _____________ Tarpley, 945 F.2d 806, 809 (5th Cir. 1991), cert. denied, 112 S. _______ _____ ______ Ct. 1960 (1992); Dang Vang v. Vang Xiong X. Toyed, 944 F.2d 476, _________ ___________________ 14 479 (9th Cir. 1991); Murphy v. Chicago Transit Auth., 638 F. ______ ______________________ Supp. 464, 467 (N.D. Ill. 1986); Johnson v. Hackett, 284 F. Supp. _______ _______ 933, 937 (E.D. Pa. 1968). Even though "acting under color of law" includes "acting under pretense of law" for purposes of a state action analysis, there can be no pretense if the challenged conduct is not related in some meaningful way either to the officer's governmental status or to the performance of his duties. C. Separating Wheat from Chaff. C. Separating Wheat from Chaff. ___________________________ Explicating the standard for segregating private action from action attributable to the state does not complete our task. Since the private conduct of police officers does not constitute action attributable to the state and, therefore, does not give rise to section 1983 liability under DeShaney or otherwise, we ________ must determine whether Valentin, at the time and place in question, was engaged in purely personal pursuits or, conversely, whether he was acting under color of state law. To do so, we must assess the nature of his conduct in light of the totality of surrounding circumstances. See Pitchell, 13 F.3d at 548; Revene ___ ________ ______ v. Charles County Comm'rs, 882 F.2d 870, 872-73 (4th Cir. 1989); ______________________ Traver v. Meshriy, 627 F.2d 934, 938 (9th Cir. 1980). ______ _______ Here, the record is transpicuously clear that throughout the course of Martinez' ordeal Valentin did not exercise, or purport to exercise, any power (real or pretended) possessed by virtue of state law. To the contrary, Valentin was 15 bent on a singularly personal frolic: tormenting an acquaintance.5 Though on duty and in uniform, Valentin's status as a police officer simply did not enter into his benighted harassment of his fellow officer. Hazing of this sort, though reprehensible, is not action under color or pretense of law. Nor can it be said that Valentin's actions were in any meaningful way related either to his official status or to the performance of his police duties. In this regard, the case bears a resemblance to Delcambre. There, the Fifth Circuit ruled that _________ the plaintiff, who had been assaulted on the premises of the municipal police station by her brother-in-law, the police chief, had no cognizable claim under 42 U.S.C. 1983. See Delcambre, ___ _________ 635 F.2d at 408. The assault arose out of a family squabble, and the court found that the police chief, though on duty, "was not acting under color of law as required for liability under [section 1983]." Id. ___ To be sure, Valentin shot Martinez with his service revolver, and in that sense it might be argued that the shooting was made possible by Valentin's status as a police officer. See ___ Cassady v. Tackett, 938 F.2d 693, 695 (6th Cir. 1991) (concluding _______ _______ that, in "allegedly flourishing and threatening to use his gun" against a coworker, the defendant acted under color of state law because he "had authority or power to carry the gun in the jail  ____________________ 5To use the plaintiff's spoken characterization, Valentin was "hors[ing] around"; or, as plaintiff put it in his second amended complaint, "playing `Russian roulette' with another man's genitalia." 16 only because he was [the county's] elected jailer"). This argument succumbs for a very basic reason: plaintiff did not proffer it either in the district court or in his appellate brief. The argument is, therefore, not properly before us. See ___ United States v. Slade, 980 F.2d 27, 30 n.3 (1st Cir. 1992) ______________ _____ (stating that theories not briefed on appeal are waived); Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline ____________________________________________________ _________ Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle ___________ is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."). Even if the argument were properly before us, we would not embrace it. We do not think it is reasonable to hold that every use of a policeman's gun, even in the course of purely _____ personal pursuits, creates a cause of action under section 1983. Instead, we are of the view that the context in which a service revolver is used, not just the mere fact of its use, must be consulted to determine the constitutional relevance of the officer's conduct. See Payne v. Government of D.C., 559 F.2d ___ _____ ___________________ 809, 825 n.9 (D.C. Cir. 1977). Consequently, "[w]hile a police officer's use of a state-issue weapon in the pursuit of private activities will have `furthered' the 1983 violation in a literal sense," a court needs "additional indicia of state authority to conclude that the officer acted under color of state law." Barna, 42 F.3d at 817-18 (holding that "unauthorized use _____ 17 of a police-issue nightstick is simply not enough to color [a] clearly personal family dispute with the imprimatur of state authority"). Here, plaintiff has not produced any evidence tending to show that his tormentor, when brandishing the firearm, was exercising or purporting to exercise police power.6 In the absence of any additional indicia of state action, we believe that the unauthorized use of a government-issue weapon is too attenuated a link to hold together a section 1983 claim. See ___ Barna, 42 F.3d at 818-19; Payne, 559 F.2d at 825 n.9; see also _____ _____ ___ ____ Bonsignore v. City of N.Y., 683 F.2d 635, 638-39 (2d Cir. 1982) __________ _____________ (holding that a police officer who wounded his wife and killed himself using a gun which he was authorized to carry because of his status as an officer "was not acting under color of state law since his actions were not `committed in the performance of any  ____________________ 6Had Martinez been a civilian rather than a fellow officer, the significance of Valentin's uniform and weapon for purposes of the color-of-law determination might well have been greater. See, e.g., Jones v. Gutschenritter, 909 F.2d 1208, 1212-13 (8th ___ ____ _____ ______________ Cir. 1990) (observing that the presence of a uniformed and armed police officer may reasonably cause a civilian to refrain from taking action to protect his rights). But when the victim is himself a fellow officer and the particular interaction between the two officers is of a distinctively personal nature, it can generally be assumed that the aggressor's official trappings, without more, will not lead the victim to believe that the aggressor is acting with the imprimatur of the state and, in turn, to forgo exercising his legal rights. The facts in this case are congruent with this hypothesis. The campaign of terror that Valentin mounted was patently personal in nature, and Martinez unquestionably realized as much; indeed, there was not the slightest indication that Valentin's conduct was undertaken pursuant to the authority of his office. Plainly, the fact that Martinez walked away numerous times shows that he was not "so intimidated" by Valentin's status as a policeman "as to cause him to refrain from exercising his legal right[s]." Id. at 1212. ___ 18 actual or pretended duty,' but were performed `in the ambit of [his] personal pursuits'") (quoting Screws, 325 U.S. at 111; ______ Johnson, 284 F. Supp. at 937). _______ We add an eschatocol of sorts. Even if a constitutional duty to intervene conceivably could be dragooned from these facts, then in that event the location of this case in the penumbra of DeShaney dictates that the defendants nonetheless ________ would enjoy qualified immunity and, since appellant's suit only seeks money damages, the defendants would be entitled to an affirmance on this alternative ground. See, e.g., Garside, 895 ___ ____ _______ F.2d at 48-49 (explaining that a grant of summary judgment can be affirmed on any independently sufficient ground made manifest in the record). We elaborate below. "In analyzing a claim of qualified immunity, . . . we are concerned with clearly established constitutional or ____________________ statutory rights of which a reasonable officer would have known at the time he took action." Crooker v. Metallo, 5 F.3d 583, 584 _______ _______ (1st Cir. 1993) (emphasis supplied). When used in this context, the phrase "clearly established" has a well-defined meaning. It denotes that at the time the challenged conduct occurred the contours of the right were sufficiently plain that a reasonably prudent state actor would have realized not merely that his conduct might be wrong, but that it violated a particular constitutional right. See Anderson v. Creighton, 483 U.S. 635, ___ ________ _________ 640 (1987); Buenrostro v. Collazo, 973 F.2d 39, 42 (1st Cir. __________ _______ 1992). The inquiry into the nature of a constitutional right for 19 the purpose of ascertaining clear establishment seeks to discover whether the right was reasonably well settled at the time of the challenged conduct and whether the manner in which the right related to the conduct was apparent. See Wiley v. Doory, 14 F.3d ___ _____ _____ 993, 995 (4th Cir. 1994) (Powell, J., sitting by designation). In mounting this inquiry, courts may neither require that state actors faultlessly anticipate the future trajectory of the law, see Crooker, 5 F.3d at 585 (noting that a state actor is not ___ _______ "expected to carry a crystal ball"), nor permit claims of qualified immunity to turn on the eventual outcome of a hitherto problematic constitutional analysis, see, e.g., Collins v. ___ ____ _______ Marina-Martinez, 894 F.2d 474, 478 (1st Cir. 1990) (recognizing _______________ that "a plaintiff who is entitled to prevail on the merits is not necessarily entitled to prevail on the issue of qualified immunity"); accord Amsden v. Moran, 904 F.2d 748, 751-52 (1st ______ ______ _____ Cir. 1990) (citing other cases), cert. denied, 498 U.S. 1041 _____ ______ (1991). Here, there can be no doubt that, at the moment the maiming of Martinez materialized, legitimate questions abounded as to whether the conduct at issue violated Martinez' constitutional rights. After all, DeShaney had not yet been ________ decided; thus, the whole question of a constitutional duty to intervene was cloaked in uncertainty. Even now, with the guidance furnished by the DeShaney Court, the precise contours of ________ the rule as it applies to onlooker officers are murky. Consequently, even if Martinez had some basis for a claim that 20 the defendants owed him a duty grounded in the Constitution, the dimensions of the right were dimly perceived (if perceived at all). It follows inexorably that the defendants would be entitled to qualified immunity and, hence, entitled to brevis ______ disposition. D. Other Theories. D. Other Theories. ______________ In addition to his principal due process claim, Martinez advances several other theories. All are unavailing. We mention three of them (rejecting the remainder without further elaboration). 1. Violation of Local Law. Martinez urges that the 1. Violation of Local Law. _______________________ defendants' breach of a provision of Puerto Rico's Civil Code, P.R. Laws Ann. tit. 25, 1003 (1980),7 furnishes a basis for liability under 42 U.S.C. 1983. He is wrong. It is established beyond peradventure that a state actor's failure to observe a duty imposed by state law, standing alone, is not a sufficient foundation on which to erect a section 1983 claim. See, e.g., Amsden, 904 F.2d at 757; Chongris, 811 ___ ____ ______ ________ F.2d at 42-43. Although it is true that constitutional significance may attach to certain interests created by state  ____________________ 7The statute provides in pertinent part that police officers have a duty to protect persons and property, to maintain and keep the public order, to observe and secure the utmost protection of the civil rights of the citizens, to prevent . . . crime and . . . enforce obedience to the laws . . . . P.R. Laws Ann. tit. 25, 1003 (1980). 21 law, see, e.g., Chongris, 811 F.2d at 43 (recognizing that ___ ____ ________ "property rights, while protected by the federal Constitution, are creatures of state law"), not every transgression of state law does double duty as a constitutional violation. The Constitution is a charter of carefully enumerated rights and responsibilities, defining the relationship between the people and a government of limited powers. Its scope and application are necessarily determined by its own terms. Though grand in its design and eloquent in its phrasing, the Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations no matter how egregious those violations may appear within the local legal framework.8 Moreover, while the plaintiff states that section 1003 creates a constitutionally protected "entitlement" under Board of ________ Regents v. Roth, 408 U.S. 564, 576-77 (1972), he does not develop _______ ____ the thesis and we do not see how Roth applies. Neither Roth's ____ ____ focus nor its procedural design bears any similarity to the case at hand. For one thing, the Roth Court's conception of a ____ cognizable constitutional entitlement was limited to property interests. See id. (citing Goldberg v. Kelly, 397 U.S. 254 ___ ___ ________ _____ (1970)). We fail to intuit how Roth supports the plaintiff's ____  ____________________ 8The absence of a constitutional duty to intervene in no way ______________ detracts from the callous nature of the conduct attributed to the officers in this case, nor does it imply that onlooker officers confronted by private violence may not have a state law duty to intervene. That question, quite simply, lies beyond the borders of this opinion. 22 claim that he had an entitlement, pursuant to section 1003, to be protected in his physical person. For another thing, the remedial framework contemplated by Roth procedural due process, ____ principally in the form of notice and a hearing, see id. at 577  ___ ___ has no applicability at all to Martinez' remonstrance. Whatever other uncertainties may plague this case, it is clear that Martinez is claiming a substantive due process violation, not a ___________ procedural due process violation. See, e.g., Amsden, 904 F.2d at __________ ___ ____ ______ 753-54 (delineating differences). In sum, Roth is a round hole, and Martinez' square peg ____ of a case does not fit within it. 2. Equal Protection. The plaintiff makes the bold 2. Equal Protection. ________________ assertion that he was denied rights secured to him under the Equal Protection Clause because, were he a private citizen, the defendants would almost certainly have come to his rescue. He does not embellish this ipse dixit in any way.9 Consequently, ____ _____ it does not assist his cause. "It is settled in this circuit that issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned." Ryan v. Royal Ins. Co. of Am., 916 F.2d 731, ____ ______________________ 734 (1st Cir. 1990); accord United States v. Zannino, 895 F.2d 1, ______ _____________ _______  ____________________ 9This criticism rests neither on the economy of Martinez' asseveration nor on its potential incoherence, but, rather, on the utter lack of any legal foundation provided for the claim; _____ Martinez makes reference to no constitutional provision, no statute, no case law, no treatise, not even a law review article. Parties to legal controversies must do more than allege unsupported facts to survive summary judgment; they must at the very least explain the basis for, and the legal significance of, those facts. 23 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990); Collins v. _____ ______ _______ Marina-Martinez, 894 F.2d 474, 481 n.9 (1st Cir. 1990). So it is _______________ here: the plaintiff's fleeting reference to equal protection does not succeed in preserving the issue for review.10 3. Supervisory Liability. Finally, the plaintiff 3. Supervisory Liability. ______________________ maintains that Trinidad, if not liable under section 1983 as an onlooker officer, may be held liable qua shift supervisor for ___ Valentin's acts. "Supervisory liability attaches only if a plaintiff can demonstrate by material of evidentiary quality an affirmative link between the supervisor's conduct and the underlying section 1983 violation." Maldonado-Denis v. Castillo- _______________ _________ Rodriguez, 23 F.3d 576, 583 (1st Cir. 1994); see also Febus- _________ ___ ____ ______ Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir. 1994); _________ _________________ Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. ___________________ _________ 1989). Because no underlying constitutional violation in fact occurred, see supra Part III(C), no supervisory liability can be ___ _____  ____________________ 10To the extent that our dissenting colleague proposes that the defendants' nonintervention cannot be deemed rational, see ___ post at pp. 30-31, this is merely another way of disagreeing with our conclusion that Valentin's conduct was private, not public. As for the larger issue of drawing distinctions between the private and the public, we note simply that such distinctions are regularly and validly drawn by courts and legislatures alike. See, e.g., Westlands Water Dist. v. Amoco Chem. Co., 953 F.2d ___ ____ ______________________ ________________ 1109, 1113 (9th Cir. 1991) (finding a rational basis for distinguishing between public and private tortfeasors in regard to recovery of punitive damages); Southern Cal. Edison Co. v. __________________________ United States, 415 F.2d 758, 760 (9th Cir.) (noting that "under _____________ the equal protection clause the separate classification of privately and publicly owned utilities has long been held justifiable"), cert. denied, 396 U.S. 957 (1969). It is this _____ ______ very distinction public versus private that undergirds not only DeShaney but also the Bill of Rights itself. ________ 24 attributed to Trinidad under section 1983.11 IV. CONCLUSION IV. CONCLUSION We need go no further. Because the defendants' failure to intervene and protect the plaintiff against Valentin's private actions, though regrettable, cannot be said to have violated rights secured to the plaintiff by the United States Constitution, see DeShaney, 489 U.S. at 196-97, the district ___ ________ court did not err in summarily disposing of the federal claims. And, once the court determined so far in advance of trial that no legitimate federal question existed, the jurisdictional basis for plaintiff's pendent claims under Puerto Rico law evaporated. See ___ Brennan, 888 F.2d at 196. Thus, the court properly dismissed the _______ balance of the complaint.12 Affirmed. Affirmed. ________ Dissent follows   ____________________ 11Moreover, Trinidad was not the supervisor on Valentin's shift (during which Martinez was shot), but, rather, on the subsequent 4:00 a.m. to 12 noon shift. Thus, it is far from clear that supervisory liability would be a viable theory vis-a- vis Trinidad even if an underlying constitutional violation could be shown. 12Of course, the dismissal operates without prejudice to whatever rights plaintiff may have to prosecute the pendent claims in the courts of Puerto Rico. See Feinstein v. RTC, 942 ___ _________ ___ F.2d 34, 47 (1st Cir. 1991). 25 BOWNES, Senior Circuit Judge, dissenting. For the BOWNES, Senior Circuit Judge, ____________________ reasons that follow, I cannot join the majority opinion. I start with the facts. Although the majority's factual recitation is not inaccurate, it is not a full-bodied portrayal of what happened. I. I. Plaintiff, Martinez, was a young (age twenty) and comparatively new member of the Puerto Rico Police Force. On the day of the events giving rise to this case, he arrived at the police station sufficiently early to be given his duty assignment. Martinez parked his car in the police parking lot. He got out of his car and started towards the police station to get his orders for the day. There were four other police officers in the lot: the defendants -- Colon, V lez and Trinidad -- and Valentin, who is not a defendant. As the majority acknowledges, the defendants were, at all relevant times, on duty as police officers and acting under color of state law. The three defendants observed the events that took place in the parking lot and the police station and heard Valentin's denigrating remarks to Martinez. None of the defendants asked Valentin to stop his verbal and physical assaults against Martinez. To put it starkly, they stood by and watched without protest Valentin "blow away" Martinez's penis. 26 As Martinez walked across the parking lot, Valentin said to the defendants, "Here comes Pretty Boy." Valentin then accosted Martinez, drew his service revolver, pointed it directly at Martinez's genital area, cocked it, put his finger on the trigger, asked Martinez if he was afraid, and then lowered the revolver. Martinez told Valentin: "Don't horse around with that because you will kill me." Martinez then proceeded into the station house. A short time later Valentin again confronted Martinez; this time he pushed his finger through a hole in Martinez's undershirt and ripped the shirt open. The record does not disclose whether any words were spoken at this juncture. Martinez put his police uniform on and reported to his shift supervisor, defendant Trinidad. A short time later Valentin again assaulted Martinez. This assault was similar to the first confrontation, but with an ominous threat. This time Valentin pushed the muzzle of his loaded and cocked revolver into the front of Martinez's pants and threatened to "blow away" Martinez's penis. Valentin then asked Martinez if he was scared. After Valentin withdrew the weapon, Martinez moved away from him. A short time later, within minutes, Valentin again accosted Martinez. He loaded and cocked his revolver and then inserted it into the front of Martinez's pants while 27 continuing to verbally abuse him. The charade ended when Valentin's revolver discharged. Valentin's prior threat became a reality; Martinez's penis was in fact blown away and he was rendered permanently impotent. The majority calls the shooting accidental and says, "All parties agree that the shooting . . . was unintentional." Ante at 4. Whether the shooting was ____ accidental or not, it can be concluded, based on Valentin's words and actions, that it was an accident that was bound to happen. What Valentin did makes Russian roulette seem like a parlor game. II. II. The majority's central holding is premised on a ruling that Valentin was not acting under color of state law. In my view, the facts taken in the light most favorable to plaintiff establish that Valentin was acting under color of state law.  As the majority points out: "`[T]he traditional definition of acting under color of state law requires that the defendant have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of the state.'" Ante at 13 ____ (quoting West v. Atkins, 487 U.S. 42, 49 (1988)) (ellipses ____ ______ and internal quotation marks omitted). Simply stated, "a person acts under color of state law `when he abuses the 28 position given him by the State.'" Id. (quoting West, 487 ___ ____ U.S. at 50). I think that Valentin exercised power possessed by virtue of Puerto Rico law and made possible only because he was clothed with the authority of Puerto Rico, and that he abused that power. Even if I disregard the obvious -- that Valentin was in uniform, on duty, in the police station, and used his service revolver to commit the tort (all of which militate heavily in favor of a finding that Valentin abused his position as a police officer) -- I believe that Valentin's status as a police officer was the only reason the defendants took no action. If Valentin had been a private citizen and had been tormenting Martinez in the same manner, the bystander officers certainly would have intervened. The record gives rise to a reasonable inference that Valentin's police-officer status led the bystander officers to conclude that: (1) Valentin was not mentally unbalanced to the point that he might actually shoot Martinez, but a stable person only engaged in harassment or horseplay; and (2) Valentin was skilled enough with firearms to be allowed to engage in this sort of stupidity. Consequently, the record gives rise to an inference that Valentin's police-officer status was a sine ____ qua non of the bystander officers' non-intervention. In my ___ ___ view, this inference establishes that Valentin was acting under color of state law.  29 The majority suggests that Martinez's status as a __________ police officer somehow reduced the likelihood that Martinez perceived Valentin to be acting with the imprimatur of the Commonwealth. See id. at 17 n.6. I believe the opposite ___ ___ conclusion is at least as likely to be true. After the bystander officers (including Trinidad, who had supervisory authority) failed to intervene during the initial rounds of abuse by Valentin, Martinez could well have concluded that this type of hazing of young officers was standard fare in the Loiza Street Precinct. Therefore, Martinez could well have believed that the Commonwealth acquiesced in Valentin's actions. Because Valentin was acting under color of state law, I think it pellucid that DeShaney does not bar this ________ suit. At most, DeShaney precludes civil rights actions ________ against state actors under the Due Process Clause for failing to protect an individual against private violence. See 489 _______ ___ U.S. at 197. The DeShaney majority took pains to distinguish ________ the case before it from situations where the state itself, through its own affirmative action prior to the complained-of non-intervention, limited the victim's freedom. Id. at 198- ___ 201 (contrasting situations where the state has taken custody of certain individuals and thereby incurred "some responsibility for [their] safety and well-being"). Here, the Commonwealth, acting through the person of Valentin, 30 compromised Martinez's freedom by successively assaulting him three times with a loaded service revolver. See West, 487 ___ ____ U.S. at 49. In my view, this infringement was more than sufficient to support Martinez's substantive due process claim. DeShaney, 489 U.S. at 200 ("In the substantive due ________ process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty -- which is the `deprivation of liberty' triggering the protections of the Due Process Clause.").  I believe it important to comment on three discrete parts of the majority opinion. The majority concedes that Valentin's use of his service revolver might arguably bring his actions within the color of state law. Ante at 16. This ____ is then rejected on two grounds: that it was not raised in the district court or plaintiff's appellate brief; and on the merits. I cannot help but wonder why the straw man approach was used. In any event, I disagree on both grounds. Fairly construed, Martinez's argument that Valentin's status as an on-duty police officer made him a state actor incorporates the argument that Valentin used the indicia and tools of his trade (including his service revolver) to carry out the shooting. For me, this is more than enough to allow us to consider Valentin's use of his 31 service revolver as a factor in determining whether he was a state actor. I am also am troubled by the majority's finding that Martinez waived his equal protection claim. Id. at 22. ___ As an initial matter, I think it important to state that the claim appears to have some substance. How, after all, can it be rational for bystander officers not to intervene simply because one of their own -- as opposed to a civilian -- is being victimized by violence? What legitimate state objective could such inaction serve? The majority finds that Martinez abandoned this claim because he failed to "embellish" it sufficiently. Id. ___ I do not think that the issue needed any embellishing. It was called an equal protection claim and stated relatively clearly: "If Wilfredo had been a private citizen, it seems clear that defendants-appellees would have realized that they were obliged under the law to protect him from the threat of serious damages." Appellant's Brief at 9. In my view, this was sufficient to put the claim in issue. Finally, I think it important to refute the majority's suggestion that Valentin might not have been acting under color of state law even if Martinez had been a ____ __ civilian. Ante at 17 n.6 ("Had Martinez been a civilian ____ rather than a fellow officer, the significance of Valentin's uniform and weapon for purposes of the color-of-law 32 determination might well have been greater.") (emphasis _____ ____ ____ ____ supplied). I find the suggestion remarkable. If a civilian had suffered the abuse Martinez experienced at the hands of an on-duty, uniformed police officer using his service _________________________________________________________ revolver in front of other officers in a police station, ____________________________________________________________ well-settled precedent would dictate a finding that the civilian was victimized under color of state law. We should not even hint that this may not be so. III. III. I also cannot agree with the majority's conclusion that an unargued qualified immunity theory provides an alternative ground for affirmance in this case. See id. at ___ ___ 18-20. Under the qualified immunity doctrine, "government officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In ______ __________ determining whether a right was "clearly established" at the relevant point in time, courts must analyze it at the appropriate level of specificity. Thus, a right is not "clearly established" for qualified immunity purposes unless its contours are sufficiently clear so "that a reasonable 33 official would understand that what he is doing violated that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). ________ _________ The majority suggests that Martinez's right to have the bystander officers intervene on his behalf was "cloaked in uncertainty" and was "murky" at the time of the relevant events. I disagree. As the majority concedes, it was settled at the time of the events in this case that  [a]n officer who is present at the scene [of an arrest] and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance, provided that he had a realistic opportunity to prevent the other officer's actions.  Ante at 9 (citations and internal quotation marks omitted). ____ In my view, this line of authority controls here.  The majority distinguishes this precedent by suggesting that it is inapplicable where the tortfeasor officer is not acting under the color of state law, and then concludes that Valentin was not so acting here. For the reasons I have explained above (and despite the opinion of my esteemed colleagues), I do not think that an objectively reasonable police officer could have seen Valentin's actions as purely private. And because Valentin was acting under the color of state law, the aforementioned authority was sufficient to have informed defendants of their obligation to intervene on Martinez's behalf. See Anderson, 483 U.S. at ___ ________ 640 ("This is not to say that an official action is protected 34 by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.") (citation omitted). If excessive force during the course of a lawful arrest requires intervention, so too should an assault with a deadly weapon taking place during the course of an entirely unlawful seizure. I therefore ________ disagree with the majority's qualified immunity analysis. IV. IV. Police officers are entrusted with great powers -- including the privileged use of force -- for the very purpose of preventing lawless violence. When an officer abuses those powers in front of his peers, he in effect presumes their tacit acquiescence, if not outright approval. In this situation, the other officers have a constitutional duty to intervene. I therefore respectfully dissent. 35