Zasha **ZAMBRANA–MARRERO,**
et al., Plaintiffs,

v.

Carlos **SUAREZ–CRUZ,**
et al., Defendants.

Civil No. 94–1212 (SEC).

United States District Court,
D. Puerto Rico.

March 31, 1998.

Judith Berkan, Río Piedras, Antonio Bauzá–Torres, San Juan, PR, for Plaintiffs.

Gustavo A. Gelpi, Feldstein, Gelpi, Hernández & Gotay, Old San Juan, PR, John F. Nevares, Smith & Nevares, San Juan, PR, John M. Garcia–Nokonechna, García & Fernández Law Offices, Hato Rey, PR, for Defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

This case is before the Court on defendant Ismael Betancourt–Lebrón's motion for summary judgment (**Docket # 133**), which was duly opposed (**Docket # 145**). Defendant Betancourt–Lebron contends that the above-captioned matter should be dismissed in its entirety because the two policemen whose conduct is the object of this lawsuit did not act under color of law when they assaulted the decedent, plaintiffs' father and husband. Because we believe that co-defendants Carlos Suárez–Cruz and Angel Rolón–Mercado did not act under color of law, we hereby **GRANT** Betancourt's motion. We therefore do not deem it necessary to address the remaining motions to dismiss and/or for summary judgment, filed by Suárez–Cruz's and Rolón–Mercado's various supervisors (**Dockets # 118, 125, 126 and 132**), which were essentially based on lack of supervisory liability. Nevertheless, we will refer to them insofar as they address the "color of law" issue in particular.

### Summary Judgment Standard

The First Circuit has clearly established that "summary judgment will lie if the record, even when taken in the aspect most favorable to the nonmovant, ... fails to yield a trialworthy issue as to some material fact." *Martínez v. Colón,* 54 F.3d 980, 983–84 (1st Cir.1995). It has further held that "[i]n applying this principle, it is important to bear in mind that ... [i]t is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Id.* at 984.

As the preceding case law intimates, the mere existence of a factual dispute is not enough to defeat summary judgment. *United Structures, Inc. v. G.R.G. Engineering, S.E.,* 927 F.Supp. 556, 560 (D.P.R.1996). In those cases where there are factual disputes, summary judgment will be deemed proper if the unresolved facts are not genuine and material to the resolution of the case. *Corporacion Insular de Seguros v. Reyes Mu-*

ñoz, 849 F.Supp. 126, 132 (D.P.R.1994). For a dispute to be "genuine", "the factual controversy 'must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.'" *Lynne Woods–Leber v. Hyatt Hotels of Puerto Rico. Inc.*, 124 F.3d 47 (1st Cir.1997). *See also U.S. v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir.1992); *Boston Athletic Assn. v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989). By like token, for a dispute to be deemed "material," the fact must be one that might affect the outcome of the suit under the governing law. *Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994).

In determining whether to grant a summary judgment motion, the Court may not, however, weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id. citing Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines*, 42 F.3d at 684.

Defendants assert that plaintiffs' opposition to the summary judgment motion is not only substantively flawed, but also procedurally defective because it fails to comply with the so-called "anti-ferret rule"; that is, it does not present a concise statement of material facts as to which there is a genuine issue to be tried, which is something that Local Rule 311.12 requires.[1]

This Court has previously expressed that "[w]hen a party opposing a motion for summary judgment fails to comply with the 'anti-ferret rule,' the statement of material facts filed by the party seeking summary judgment [shall be] deemed ... admitted." *Méndez–Marrero v. Toledo*, 968 F.Supp. 27 (D.P.R.1997), *referring to Dominguez v. Eli Lilly & Co.*, 958 F.Supp. 721, 727 (D.P.R. 1997). *See also Tavarez v. Champion Products, Inc.*, 903 F.Supp. 268, 270 (D.P.R.1995). Otherwise, the Court would be forced to search "through the entire record for evidence of genuine issues of material fact which might preclude the entry of summary judgment." *Méndez–Marrero*, 968 F.Supp. at 34, *referring to Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 930–31 (1st Cir.1983). Although the non-movant's failure to provide a statement of uncontested material facts does not automatically warrant the granting of summary judgment, "it launches the non-movant's case down the road towards an easy dismissal." *Id.*

Such is not, however, the scenario in the present case. Plaintiffs did submit a separate Rule 311.12 statement. The only problem is that they labeled it "statement of undisputed material facts" This created some confusion among defendants, who weren't sure whether plaintiffs were filing a cross-motion for summary judgment. But plaintiffs' prayer at the end of their memorandum in support of their opposition makes it clear that they were only seeking that the Court deny defendants' motions. More importantly, halfway through their 311.12 statement, plaintiffs did address several of defendants' alleged uncontested facts. It is true that plaintiffs only generally referred to their exhibits, and did not specifically direct us to a particular page within each exhibit. Never-

---

1. Local Rule 311.12 provides that:

[u]pon any motion for summary judgment, there shall be served and filed annexed to the motion a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried and the basis of such contention as to each material fact, properly supported by specific reference to the record. All material facts set forth in the statement required to be served by the moving party shall be deemed to be admitted unless controverted by the statement required to be served by the opposing party. The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried, properly supported by specific reference to the record.

theless, we will not admit defendants' alleged uncontested facts on that basis alone.

Based on the foregoing, we will analyze whether there are any genuine issues of material fact in dispute, which warrant that we do not grant summary judgment at this stage. We find that there are none.

### Factual Background

We review the facts in the light most favorable to plaintiffs. The incident which gave rise to this action took place on the night of Thursday, June 10, 1993. At around 6:00 p.m. that evening, police officers Carlos Suárez–Cruz and Angel Rolón–Mercado finished their daily shift and headed toward the parking lot of the Panasonic building in Carolina. Puerto Rico, to celebrate the birthday of a mutual friend.[2] They got there on Suárez's personal car.[3] Although they were still wearing their official, police-issue pants and boots, and were carrying their police-issue weapons pursuant to departmental regulations, they were only wearing t-shirts.[4] While at the party, they each had a couple of alcoholic drinks.[5] At around 8:00 to 8:30 p.m., they decided to head back home. Rolón asked Suárez to give him a ride to his mother-in-law's house, where his wife was waiting.[6] On the way home, however, they went by a bar often frequented by Suárez called Freddy's Pub, and Rolón persuaded Suárez to stop there for a while.[7] Freddy's Pub was, according to Suárez's own admission, a bar visited by people of dubious reputation, and thus a place they were not allowed to go to under departmental regulations.[8]

By the time Rolón and Suárez got to Freddy's Pub, there were at least ten people in the bar, including Rembert Zambrana.[9] According to the bar's owner, Freddie Casablanca, Zambrana got there at around 6:00 p.m., after having had a heated argument with his wife, Brunilda Marrero.[10] Casablanca learned about this incident through his girlfriend, who was a good friend of Zambrana's wife. Apparently upset about the fact that his wife had been unfaithful, Zambrana hit her with a baseball bat and threatened to kill her when he got back from the bar.[11] When he got to the bar. Zambrana started drinking copiously, mixing vodka and tequila shots.[12] He was also high on cocaine.[13]

When Suárez went into the pub, he was greeted by Zambrana, who offered him a drink.[14] Suárez and Zambrana were both frequent patrons of the bar.[15] Suárez even belonged to its billiards team, so he went there at least once a week. Everyone knew he was a police officer.[16] Suárez allegedly noticed that Zambrana was high on cocaine because he was repeatedly grinding his teeth.[17] After greeting Zambrana, Suárez and Rolón got two beers and went over to the billiards table to play pool. They played for a couple of hours, and drank some more beer.[18]

---

**2.** Plaintiffs' Exhibit 2, at 124–25 (Docket # 146).

**3.** *Id.* at 124.

**4.** Rolón's t-shirt had the initials "DOT", the Spanish acronym for Tactical Operations Division. Plaintiffs' Exhibit 1 (Freddie Casablanca's sworn statement).

**5.** Ismael Betancourt's Exhibit # 1 (Suárez Cruz's deposition testimony), at 185 (Docket # 134).

**6.** Plaintiffs' Exhibit 2, at 125.

**7.** *Id.* at 126. *See also* Betancourt's Exhibit 1, at 186.

**8.** *See, e.g.,* Betancourt's Exhibit 1, at 129.

**9.** Plaintiffs' Exhibit 1 (Luz Menchaca's sworn statement).

**10.** Betancourt's Exhibit 3, at 60–62.

**11.** *Id.*

**12.** *Id.* at 83.

**13.** Betancourt's Exhibit 1, at 163.

**14.** Plaintiffs' Exhibit 1 (Luz Menchaca's sworn statement).

**15.** Plaintiffs' Exhibit 1 (Enrique Pagán's sworn statement); Plaintiffs' Exhibit 2, at 133.

**16.** Rolón, however, had never been to the bar before. Nevertheless, everyone at the bar assumed he was also a policeman, given that he came with Suárez and was also wearing police-issue pants and boots.

**17.** Betancourt's Exhibit 1, at 163.

**18.** Betancourt's Exhibit 1, at 186–87.

By 10:00–10:30 p.m., the bar was already crowded with people.[19] Two other frequent patrons, Mr. Kashua Seda and his daughter, Astrid (Casablanca's girlfriend), went in and sat next to Zambrana, who was already visibly drunk.[20] Zambrana allegedly told Mr. Seda that he had recently met two prostitutes: his wife Brunilda, and Seda's daughter (who was a friend of his wife). Upon hearing this, Seda and his daughter got up and left.[21] When Casablanca learned about how Zambrana had referred to his girlfriend, he confronted him.[22] The verbal altercation which ensued soon escalated into a brawl. Everyone gathered around them to watch and/or to try to separate them.[23]

Among those who saw the developing brawl was Rolón, who had just gone to the bar area to get two more beers. When he got back to the pool area, he excitedly told Suárez about the fight, gave him the two beers and decided to step in, pool cue and billiard ball in hand.[24] Suárez followed him. According to eye witness accounts, at least five other people attempted to intervene in the fight.[25] When Rolón and Suárez got there, Zambrana and Casablanca were on the floor, and Zambrana was attempting to choke Casablanca with his neck chain.[26] Suárez got a hold of Zambrana, forcing him to let go of Casablanca, and pulled Zambrana against the

wall. As Suárez held Zambrana, Rolón proceeded to hit him with everything he could: the cue, the billiard ball, his boots, and even the back of his revolver.[27] Since Zambrana was allegedly uncontrollable, Suárez handcuffed him with his police-issue handcuffs, while Rolón kept hitting him.[28] Rolón allegedly told those who were gathered around him not to intervene because they were policemen.[29] That did not, however, keep eyewitnesses from trying to put a stop to the assault. One of them, Luz Menchaca, allegedly tried to push Rolón so that he would stop beating Zambrana, and pleaded with him to stop.[30] According to Suárez, the whole incident lasted about one minute.[31]

When Casablanca, who had gone to the bathroom to wash up, came back and saw the fight, he told Suárez to take it outside.[32] Suárez and Rolón then took Zambrana outside, who fell to the floor in pain. Once outside, they searched Zambrana and took his wallet from him, keeping his ATM card.[33] They also found a small amount of cocaine on him, but after a friend of Zambrana told them to "give him a break", they decided not arrest him.[34] Suárez and Rolón left the scene shortly thereafter. Apparently, later that night, Suárez attempted to extract money from an ATM machine with Zambrana's card, and when he was unable to do so, he shot at the machine.[35]

---

19. Plaintiffs' Exhibit 1 (Luz Menchaca's sworn statement).

20. Zambrana ran a tab of about $60.00 at a place where drinks were only about $2.00 each. Although he did invite a couple of people to drinks, he could have easily mixed at least 15–20 shots of vodka and tequila. It is worth noting that Zambrana was around five feet, seven inches tall, and weighed about 250 pounds.

21. Plaintiffs' Exhibit 1 (Kashua and Astrid Seda's sworn statements).

22. Betancourt's Exhibit 3, at 33–34.

23. Plaintiffs' Exhibit 1 (Luz Menchaca's sworn statement; Freddie Casablanca's sworn statement).

24. Betancourt's Exhibit 1, at 165–66.

25. Plaintiffs' Exhibit 1 (Freddie Casablanca's sworn statement: Enrique Pagán's sworn statement).

26. Plaintiffs' Exhibit 25, at 35.

27. Plaintiffs' Exhibit 2, at 112.

28. See, e.g., Betancourt's Exhibit 1, at 114–15. See also Plaintiffs' Exhibit 1 (Luz Menchaca's sworn statement).

29. Plaintiffs' Exhibit 1 (Luz Menchaca's sworn statement).

30. Id.

31. Plaintiffs' Exhibit 2, at 112.

32. Plaintiffs' Exhibit 25, at 42.

33. See, e.g., Plaintiffs' Exhibit 2, at 169.

34. See, e.g., Plaintiffs' Exhibit 2, at 191–193.

35. Plaintiffs' Exhibit 1 (Investigation by Special Investigations Bureau).

Zambrana, who was left lying on the floor, was carried home, and then to a hospital.[36] He was later transferred to a different hospital, where he died three days later of a renal failure. Soon thereafter, Rolón shot his wife to death and then took his own life.[37] Suárez underwent psychiatric treatment for depression at the State Insurance Fund, and was subsequently accused of being a member of a corrupt group of policemen.[38] He is currently enrolled in a local witness protection program, after he agreed to testify against other corrupt policemen.

**Applicable Law**

It has long been established that § 1983 liability only attaches when a person violates the Constitution or laws of the United States while acting "under color of state law". *See generally,* Erwin Chemerinsky, *Federal Jurisdiction* § 8.3 (1994). In *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), the United States Supreme Court first defined the concept of "under color of law" within the context of a criminal statute containing language similar to that of § 1983. The Court concluded that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color' of state law." *Id,* 313 U.S. at 326.

Subsequently, in *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the Supreme Court held that "acts of officers who undertake to perform their official duties are included [within the definition of 'under color of law'], whether they hew to the line of their authority or overstep it." *Id.,* 325 U.S. at 111. The Court further suggested, however, that the "purely personal pursuits of an individual, while on or off

duty, are not actions under color of state law." *See* Note, *When Off–Duty State Officials Act Under Color of State Law for the Purposes of Section 1983,* 22 Mem. St. U.L.Rev. 725, 731 (Summer 1992).[39]

The United States Supreme Court first interpreted § 1983's "under color of state law" requirement in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Adopting the wording used in the preceding case of *U.S. v. Classic,* the Court concluded that "actions taken by an officer in his or her official capacity are deemed to have occurred under color of law even if they are not in pursuance of any official state policy and even if they violate state law." Chemerinsky, *supra* at 431.

The Supreme Court has not specifically addressed the issue of whether off-duty government officials should be held liable for their actions under § 1983. Note, *supra* at 732. In *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), the Court held that "generally, a public employee acts under color of law while acting in his official capacity or while exercising his responsibilities pursuant to state law." 108 S.Ct. at 2255–2256. In the case of most governmental officers, the use of this definition to determine when these officers act pursuant to state law or in their official capacity would seem to suffice; however, such a broad definition is much more problematic in the case of off-duty police officers who, given the nature of their work, may sometimes be required to carry their identification and their state-issue weapons and/or to be "on duty" twenty-four hours a day.

In an attempt to facilitate this determination, commentators have summarized certain factors which may be considered in ascertain-

---

**36.** Plaintiffs' Exhibit 1 (Freddie Casablanca's, Kashua Seda's and Luz Menchaca's sworn statements).

**37.** Plaintiffs' Exhibit 1 (Investigation by Special Investigations Bureau).

**38.** *See* Plaintiffs, Exhibit 2, at 19–22; Exhibit 1 (Investigation by Special Investigations Bureau).

**39.** In *Griffin v. Maryland,* 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964), the Supreme Court later limited this last ruling when it held that "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity." *Id.,* 378 U.S. at 135. *See also* Note, *supra* at 732.

ing whether an officer has exercised state authority: "whether there is a policy requiring officers to be on-duty at all times; whether the officer displayed a badge or an identification card, identified himself as a police officer, or carried or used a service revolver or other weapon or device issued by the police department; and whether the officer purported to place the individual under arrest." Chemerinsky, *supra* at 434, *citing* M. Schwartz & J. Kirklin, *Section 1983 Litigation: Claims, Defenses, and Fees* 256 (2d ed.1991).

The First Circuit has, perhaps following that lead, developed its own criteria, beginning with *Martínez v. Colón,* 54 F.3d 980 (1st Cir.), *cert. denied,* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995). In *Martínez,* a police officer was accidentally shot by a fellow officer who had approached and harassed him on at least three separate occasions by pointing his gun at his stomach and groin. The incident happened at the police station, minutes before the victim was scheduled to begin his shift. The Court essentially held that "a policeman's private conduct, outside the line of duty and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of law." *Id.* at 986–87. It further stated that "if the challenged conduct is not related in some meaningful way either to the officer's governmental status or to the performance of his duties", there cannot possibly be "color of law". *Id.* 516 U.S. at 987. Since the police officer in this case did not "purport to exercise any power possessed by virtue of state law", but was rather, "bent on a singularly personal frolic: tormenting an acquaintance", the Court concluded that his actions were not clothed in the authority of state law. "Hazing of this sort", it held, "though reprehensible, is not action under color or pretense of law." *Id.* The Court further concluded that his actions were neither related to his official status nor to the performance of his official duties in any meaningful way. *Id.*

In reaching this conclusion, the Court in *Martínez* applied a "totality of the circumstances" test. *Id.* Thus, for example, even though the police officer was using his service weapon when he fired the shot that maimed his fellow officer, the Court did not find this determinative in light of the remaining circumstances. "In the absence of any additional indicia of state action," it held, "the unauthorized use of a government-issue weapon is too attenuated a link to hold together a section 1983 claim." *Id.* at 988.

Subsequently, in *Parrilla–Burgos v. Hernández–Rivera,* 108 F.3d 445 (1st Cir.1997), the First Circuit further expanded its *Martínez* ruling. Here, a policeman who was on medical leave shot and killed another man during a fight outside a bar. Although the officer was not wearing his uniform, he was carrying his identification and service revolver, as per Puerto Rico Police Department regulations, which require police officers to carry these two items at all times and be on duty twenty-four hours a day. *Id.* at 446. While at the bar, the policeman threatened his victim, telling him that he could look at him whichever way he pleased because he was a policeman. This verbal altercation attracted a crowd, and so the officer identified himself to the crowd as a policeman who was there to establish peace and order, and even showed them his identification to prevent the crowd from interfering. Nevertheless, his victim accepted his challenge and invited him to "take the fight outside." Once outside, the policeman shot his victim six times with his service revolver.

The Court defined the controversy as "whether [the policeman] 'was engaged in purely personal pursuits or, conversely, whether he was acting under color of state law'," and proceeded to assess his conduct in light of the totality of the circumstances. *Id.* at 449. The Court summarized various factors identified in *Martínez* as "relevant, but not necessarily determinative" of this question: "a police officer's garb; an officer's duty status, including the existence of a regulation providing that officers are on duty twenty-four hours a day; the officer's use of a service revolver: and, the location of the incident." *Id., referring to Martínez,* 54 F.3d at 986–87.

Applying the *Martínez* standard, the Court concluded that although the fact that the police officer commented that he was at

the bar to "keep the peace" and displayed his identification "might, viewed in isolation, support an inference that [he] was acting under pretense of law by purporting to act in his official capacity. . ., that conclusion was belied by the rest of [his] behavior, especially his repeated assertions that he could to things such as 'look dirty' at [his victim] because he was a police officer." *Id.* at 450. In so ruling, the Court noted that "[m]ere statements by individuals that they are entitled to a special privilege because of their official status do not constitute action under color or pretense of state law if the asserted privilege lies clearly outside the scope of their official duties." *Id.* The Court further stated that "[w]hatever brief pretense [the officer] may have made to be acting in his official capacity . . . ended when the two agreed to fight it out." *Id.*

In reaching its conclusion, the Court didn't merely analyze the situation objectively; it also took into consideration how the victim may have perceived the officer's use of his authority as a policeman. The Court found the fact that the victim invited the officer to engage in a private brawl telling because it belied "any possibility that [the victim may have been] intimidated by [the policeman's] claims of official status." *Id.* at 451. This, as well as all the other displays of "private pursuits," led the Court to conclude that the policeman's actions were not carried out under color of state law.

### Application of Law to Facts

■ Plaintiffs contend that the totality of the circumstances "leads inexorably" to the conclusion that police officers Angel Rolón–Mercado and Carlos Suárez–Cruz exercised state authority at Freddy's Pub on the night of June 10, 1993. Plaintiffs argue that Rolón and Suárez intervened only after the fight between Casablanca and Zambrana was "well under way", and that they did so with the sole purpose of calming down the participants and establishing order.[40] They further maintain that Suárez handcuffed Zambrana "because [he was] a policeman who had the authority to handcuff somebody," and that Suárez knew well that he also had the authority to arrest Rolón for his conduct, but decided not to.

Plaintiffs also call our attention to the fact that Rolón told the bystanders who were attempting to intervene not to get involved because they were police officers; and that once they took Zambrana outside, they searched him and would have arrested him but for an eyewitness' plea to leave him alone.[41] They further mention that neither the cocaine nor the wallet which they seized made it to the Police Department evidence room; that Suárez attempted to use Zambrana's ATM card and that when he couldn't withdraw money from the machine, he shot it out with his service revolver. Finally, they mention the fact that Rolón, who allegedly had a history of violent actions, later killed his wife and then committed suicide.

Plaintiffs thus argue that this is not the type of situation where the police officers were in the "personal pursuit of private violence," but rather, one in which the officers exercised power "possessed by virtue of state law", and abused the position given to them by the state. The fact that Rolón and Suárez were off-duty, they maintain, is irrelevant, because the case law is clear that off-duty officers can be held liable under § 1983 if they commit their acts by using the authority with which the state endowed them. In support of this contention, plaintiffs refer, inter alia, to *United States v. Tarpley*, 945 F.2d 806 (5th Cir.1991), in which color of law was found even though the off-duty policeman in this case engaged in a private vendetta and assaulted his wife's lover.

---

**40.** In support of this contention, plaintiffs refer to the deposition testimony of one of the eyewitnesses, Edgardo Pizarro, who stated that the incident was not a fight per se, but rather, an intervention. We note, however, that Pizarro also referred to his own attempts to stop the fight as an "intervention", a fact which clearly belies any conclusion that Pizarro meant to say that this was a governmental intervention.

**41.** Plaintiffs argue that this was part of a scheme which Suárez and other officers had developed, in which he used his official power to intervene with citizens with the purpose of prosecuting them, and then gave them a break.

Plaintiffs further attempt to distinguish the instant case from *Martinez* and *Parrilla*, to which defendants make constant reference in support of their motions. According to plaintiffs, both of these cases present fact situations that are "so dramatically different from the one at bar as to be totally distinguishable." Plaintiffs underscore the fact that in *Martinez*, the Court referred to the officer's shooting as an accident in which the officer was horsing around; that he did not exercise or purport to exercise power possessed by virtue of state law; and that his action was not in any way related either to his official status or the performance of his duties. They further emphasize the fact that in *Parrilla*, the barroom dispute centered around the off-duty police officer himself and the plaintiff, whereas in the instant case the dispute began between two private individuals and the officers intervened in order to control the situation. They find revealing the fact that the First Circuit found the policemen's identification as an officer too far removed from the final shooting to be able to infer a connection between them, whereas in the instant case, "the death of Rembert Zambrana was at the hands of two police officers who exercised the authority of the Commonwealth by intervening in a private dispute between two individuals, subduing one of them, placing handcuffs on him, searching him and preparing to arrest him for illegal acts committed in their presence."

Plaintiffs thus direct us to the Sixth Circuit case of *Stengel v. Belcher*, 522 F.2d 438 (6th Cir.1975), which they allege is much closer to the facts of the instant case. In *Stengel*, an off duty policeman, who happened to be at a café with his girlfriend and another couple, intervened in a dispute and ended up shooting and killing two young men and paralyzing a third. The policeman did not have his uniform on, but he was carrying a police-issue revolver and a can of mace, which departmental regulations required him to carry at all times. Allegedly, when he saw the dispute begin to escalate, he decided to intervene. He never identified himself as a police officer, but apparently, he sprayed the individuals with mace, and when they attacked him, he drew his gun and shot two of them in the chest and another one in the back, paralyzing him instantly.

In holding that the policeman had acted under color of law, the Court underscored the fact that although he had overstepped his bounds, he intervened in the dispute pursuant to a duty imposed by departmental regulations. In fact, the Chief of Police testified that police officers were required to take action in any type of police or criminal activity twenty-four hours a day, and that they would be subject to discipline if they didn't. *Id.* at 441. The Court also emphasized the fact that a Police Department investigation had concluded that the officer's actions had taken place while in the line of duty, for which reason he received worker's compensation.[42]

We find that *Tarpley* and *Stengel* are both distinguishable from the instant action. Even though *Tarpley* dealt with an off-duty policeman engaged in a private vendetta (to assault his wife's lover), the Court emphasized the fact that the officer "did more than simply use his service weapon and identify himself as a police officer ... [H]e claimed to have special authority for his actions by virtue of his official status." *Tarpley*, 945 F.2d at 809. He also claimed that he could kill plaintiff because he was a policeman, and later summoned another police officer, identified him as an officer and ally, and ran plaintiff out of town in their squad car. *Id.* No such a display of police authority was found in the instant case.

In *Stengel*, on the other hand, the Court was obviously swayed by two very important pieces of evidence: the Police Department report which concluded that the policeman had been in the line of duty, and the departmental regulations which required officers to take action in any type of criminal activity

---

**42.** A subsequent district court case which interpreted *Stengel* emphasized that the policeman in that case had clearly "interjected himself into an altercation between two other private parties at a bar" in an "[attempt] to break up the fight." *Hudson v. Maxey*, 856 F.Supp. 1223, 1227 (E.D.Mich.1994). It also found telling that in *Stengel*, the Police Department had made a specific finding that the officer's actions had been performed in the line of duty; and that the policeman was required to take action or would be subject to discipline. *Id.*

twenty-four hours a day. None of these pieces of evidence are present in this case. Although it is true that in both *Stengel* and the instant case the police officers (in this case, Suárez). were granted some sort of workers' compensation (in this case, Suárez reported to the State Insurance Fund with psychological trauma), it is far from clear whether Suárez's referral was specifically linked to this incident. In fact, as plaintiffs state, Suárez had a history of problems at the Police Department which preceded this incident. In light of the foregoing, the fact that he underwent treatment shortly after the Zambrana incident is too attenuated a link to be able to conclude that it was part of a departmental determination that the Zambrana incident happened under color of law.

We believe the First Circuit cases of *Martinez,* and especially *Parrilla–Burgos,* to be much more persuasive. Although it is true that, as plaintiffs assert, the bar brawl in *Parrilla* revolved around the police officer himself, whereas in the instant matter, Rolón intervened in a fight which was already under way, we find this distinction inapposite. It seems clear that Rolón never intended to intervene to break up the fight; the fact that he excitedly joined in the fight with pool cue and billiard ball in hand demonstrates that he had every intention to cause damage, and not to establish order. Furthermore, we find, as did the First Circuit in *Martinez,* that it is not "reasonable to hold that every use of a policeman's gun [or handcuffs, for that matter], even in the course of purely personal pursuits, creates a cause of action under section 1983. Instead, we are of the view that the context in which a service revolver [or handcuffs are] used, not just the mere fact of [their] use, must be consulted to determine the constitutional relevance of the officer's conduct." *Martinez,* at 987–88. The context in which the handcuffs were used in this case was not the context typical of a governmental intervention (to facilitate an arrest). In the instant case, Suárez testified that he only used his handcuffs because Zambrana was aggressive and needed to be controlled; he further explained that even though Zambrana was not a big man, he was "high" on cocaine, and that rendered him uncontrollable.

Moreover, although we believe that the fact that Rolón told bystanders not to intervene because they were police officers could, "viewed in isolation, support an inference that [he] was acting under pretense of law by purporting to act in his official capacity..., that conclusion was belied by the rest of [Rolón's] behavior", especially his excitement about the fight, his brutal and random attack of Zambrana, and finally, his decision to steal his wallet. *Parrilla–Burgos,* 108 F.3d at 450. Also telling is the fact that even though Rolón told bystanders not to intervene, the eyewitnesses were clearly not intimidated by this warning, as evidenced by Menchaca's testimony that she kept yelling for him to stop and even pushed him so that he would leave Zambrana alone.

Finally, as with the handcuffs, we believe that the "search" which Rolón and Suárez conducted had little to do with the typical reason for a search. Although upon searching Zambrana, they did find a very small amount of cocaine on him, they did not arrest him, and the cocaine later "disappeared". Most probably, Rolón and Suárez's motive was purely criminal in nature; the fact that Suárez kept Zambrana's ATM and later attempted to use it lends further support to this, defendants' theory.

To sum up, the totality of the circumstances in this case leads us to conclude that the unfortunate incident that took place at Freddy's Pub on the night of June 10, 1993 was not conducted "under color of law." The officers' garb, duty status and whereabouts certainly lend support to this conclusion. More importantly, neither one of them clearly undertook to invoke police authority. They did not show their badge or their identification, and never arrested Zambrana. More likely than not, their conduct consisted of private violence engaged in by two individuals who happened to work for the state; two individuals who excitedly joined a bar brawl with every intention to cause damage, not to establish order. As the First Circuit held in *Martinez,* "[h]azing of this sort, though reprehensible, is not action under color or pretense of law." *Martinez,* 54 F.3d at 987.

**Pendent jurisdiction claims**

It is hornbook law that a district court has discretion to exercise supplemental jurisdiction over the state law claims where the state and federal claims derive from a common nucleus of operative facts. *See,* 28 U.S.C. sec. 1367; *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Nevertheless, where, as here, all federal claims warrant dismissal prior to trial, the district court should decline to exercise supplemental jurisdiction.

It has been stated that the holding in *Gibbs* "seems clearly to require dismissal without action on the merits and without any exercise of discretion if all the federal claims ... are found to be short of trial, deficient." *Snowden v. Millinocket Regional Hosp.,* 727 F.Supp. 701, 709 (D.Me.1990). Such a result is warranted in view that "[t]he power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one 'substantial' federal claim in the lawsuit". *Newman v. Burgin,* 930 F.2d 955, 963 (1st Cir.1991).

Although district courts are not obligated to dismiss pendent state law claims, in the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims. In such a case, state-law claims should be dismissed. *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n. 5, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); citing *Gibbs,* 383 U.S. at 726–727; see *Mercado–Garcia v. Ponce Federal Bank,* 979 F.2d 890, 896 (1st Cir.1992); *Rivera v. Murphy,* 979 F.2d 259, 264 (1st Cir.1992); *Figueroa Ruiz v. Alegria,* 896 F.2d 645 (1st Cir.1990); *cf. Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 47 (1st Cir.1991) (stating that "since federal question jurisdiction hinged on that [dismissed] count, and there was no complete diversity of citizenship or other cognizable basis for the assertion of subject matter jurisdiction in the district court, the pendent state law claims were properly dismissed under the rule of *United Mine Workers v. Gibbs*").

Supplemental jurisdiction should be declined in this case in view that the state law claims substantially predominate over the federal claims. The Supreme Court has held that judicial economy, convenience, fairness and comity favors "a decision to relinquish jurisdiction when 'state issues predominate, whether in terms of proof, of the scope of the issued raised, or the comprehensiveness of the remedy sought.'" *Carnegie–Mellon,* 484 U.S. at 350 n. 5, citing *Gibbs,* 383 U.S. at 726. Since plaintiff is not entitled to any award under § 1983, the only award plaintiff could, in any event, pursue would be under state tort law.

In view of the foregoing discussion, defendants' motions for summary judgment (**Dockets # 118, 125, 126, 132, and 133**) are hereby **GRANTED**, and plaintiffs' complaint for § 1983 violations is hereby **DISMISSED**. We also decline to exercise jurisdiction over plaintiff's remaining state claims against the defendants. Judgment shall be entered accordingly.

**SO ORDERED.**