Zasha ZAMBRANA–MARRERO,
et al., Plaintiffs, Appellants,

v.

Carlos SUAREZ–CRUZ, et al.,
Defendants, Appellees.

No. 98–1601.

United States Court of Appeals,
First Circuit.

Heard March 4, 1999.

Decided April 21, 1999.

Judith Berkan and Federico Lora Lopez for appellants.

John F. Nevares with whom Gustavo A. Gelpi, John M. Garcia and Isabel Abislaiman for appellees.

Before TORRUELLA, Chief Judge, COFFIN and CYR, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

This case requires us to examine once again the often difficult concept of "under color of state law" as it relates to the death of a private individual at the hands of police officers. Plaintiffs, the widow and four children of Rembert Zambrana–Rodriguez ("Zambrana"), filed this lawsuit seeking damages under 42 U.S.C. § 1983 and Puerto Rico law after Zambrana died from injuries he suffered when two police officers intervened in a fight at a bar. The district court granted summary judgment for the defendants and dismissed the pendent state law claims, on the ground that the officers' conduct constituted private violence rather than violence "under color of state law" as required for liability under section 1983. Our review of the record and case law persuades us that the issue should have gone to the jury. Accordingly, we vacate the judgment and remand for further proceedings.

## I. *Background*

Consistent with our obligation in reviewing a grant of summary judgment, we consider the facts in the light most favorable to the plaintiffs, the non-moving parties, and also draw all reasonable inferences in their favor. *See Barreto–Rivera v. Medina–Vargas,* 168 F.3d 42, 44 (1st Cir.1999).

On the night of June 10, 1993, Zambrana was socializing at Freddy's Pub in Carolina, Puerto Rico, when he insulted the girlfriend of the bar's owner, Freddie Casablanca. A verbal exchange between Zambrana and Casablanca quickly escalated into a physical fight. Other patrons in the crowded bar gathered around to watch, and some of them attempted to separate the two men.

Among those at the bar at the time were two police officers, Carlos Suarez–Cruz ("Suarez") and Angel Rolon–Mercado ("Rolon"), who had been playing pool in an area somewhat removed from the site of the fight. The officers had been together since shortly after ending their shift earlier that evening and had attended a birthday party for another officer before driv-

ing in Suarez's personal car to the pub. The officers were partially in uniform, both wearing their police-issue pants and boots. Rolon also was wearing a t-shirt identified with the letters "DOT," the Spanish acronym for the Tactical Operations Division of the police department. Both also were carrying their police-issue weapons, pursuant to departmental regulations.[1]

Rolon encountered the fight when he walked over to the bar to get more beer. He returned initially to Suarez to tell him what was going on, and then went back to where the fight was taking place, with Suarez following. At this point, Casablanca and Zambrana were on the floor; Zambrana was pulling Casablanca's neck chain, which was cutting the back of his neck and "choking" him, and Casablanca was trying to free himself. When the two fighters rose to their feet, Rolon and Suarez entered the fray: Suarez grabbed Zambrana by putting his arm around Zambrana's neck, forcing him to let go of Casablanca. Other bystanders assisted Casablanca, who went to the bathroom to clean up. Although Casablanca was no longer involved, the fracas continued. As Zambrana attempted to free himself from Suarez's hold, Rolon began hitting Zambrana with all available objects, including a pool cue and billiard ball, his boots and his service revolver.

By all accounts, Rolon's attack on Zambrana was excessively vicious.[2] Suarez sent Rolon to retrieve handcuffs from the officers' car, and Suarez managed to place them on Zambrana by sitting on top of him and pulling his arms behind his back. One witness stated that Rolon told those gathered around the scene in the bar not to intervene because he and Suarez were police officers.[3] After Zambrana was handcuffed, Casablanca told Suarez to take the fight outside.

Once outside, Rolon searched Zambrana and seized a small packet of cocaine from him. The officers also took out his wallet and kept his ATM card.[4] Suarez and Rolon left the scene a short time later, leaving Zambrana lying on the ground, seriously injured. Zambrana was taken home and, early the following morning, admitted to the hospital. He died two days later of kidney failure due to bodily trauma.

Plaintiffs filed a complaint under 42 U.S.C. § 1983 against Suarez and various of his supervisors,[5] alleging that Zambrana's civil and constitutional rights had been violated by the officers' conduct. Additional claims were asserted under Puerto

1. Puerto Rico police department policy states that officers are on duty twenty-four hours a day, even when they are not working a scheduled shift, and must carry identification and a service revolver at all times. *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 446 (lst Cir.1997).

2. There is some discrepancy regarding whether Suarez also struck Zambrana. Even if Suarez was not involved in the physical attack, however, he could be held responsible for Zambrana's death. *See Martinez v. Colon*, 54 F.3d 980, 985 (lst Cir.1995) (An officer " 'who is present at the scene ... and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance' " if he had a " 'realistic opportunity' " to prevent the other officer's actions.) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n. 3 (lst Cir. 1990)).

3. This statement was contained in a sworn declaration given by Luz Menchaca as part of an investigation conducted by the Bureau of Special Investigations of the Puerto Rico Department of Justice. The declaration, which was submitted by plaintiffs in support of their opposition to defendants' motions to dismiss, appears only in Spanish in the record. Because all of the parties agree on the substance of this particular statement, we include it in our factual summary. We have largely ignored the content of the other declarations from the same investigation, however, because they, too, are provided only in Spanish.

4. Later that night, Suarez attempted to extract money from an ATM machine using Zambrana's card and, when he was unsuccessful, he shot at the machine.

5. Rolon killed his wife and then committed suicide about a month after the incident with Zambrana.

Rico law. The defendants filed various motions to dismiss and for summary judgment, and on March 31, 1998, the district court granted summary judgment for all defendants based on its conclusion that plaintiffs had offered insufficient evidence to prove that Suarez and Rolon acted "under color of law" as required to establish a violation of section 1983. The court dismissed the pendent state law claims. This appeal followed.

## II. *Discussion*

### A. *Summary Judgment Standard*

A district court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Our review is de novo, and, as noted earlier, *see supra* at 123, we evaluate the record in the light most favorable to the non-moving party, in this case the plaintiffs. Summary judgment is appropriate only if the evidence taken in that light "fails to yield a trialworthy issue as to some material fact." *Martinez v. Colon*, 54 F.3d 980, 983–84 (1st Cir.1995). Otherwise stated, our task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In this specific case, that obligation is to decide whether a jury could find that Suarez and Rolon acted "under color of state law" when they intervened in Zambrana's fight with Casablanca and administered the blows that led to Zambrana's death.

### B. *Under Color of State Law* [6]

Establishing that the defendant acted "under color of state law" is one of two essential requirements for an action under section 1983, which imposes liability only for conduct attributable to the state.[7] In distinguishing private action from state action, the general inquiry is whether "a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or ... is such that the actor could not have behaved in that way but for the authority of his office." *Martinez*, 54 F.3d at 986. The concept can be particularly elusive when applied to police conduct, as we have recognized in three recent cases. *See Barreto–Rivera*, 168 F.3d at 45–46; *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 448–50 (1st Cir.1997); *Martinez*, 54 F.3d at 986–87. We quote from *Barreto–Rivera*:

> No single, easily determinable factor will control whether a police officer was acting under state law. While certain factors will certainly be relevant—for example, a police officer's garb, an officer's duty status, the officer's use of a service revolver, and the location of the incident—these factors must not be assessed mechanically.

168 F.3d at 45 (citation omitted).

Resolving the "under color of law" question therefore requires an assessment of the totality of the circumstances, in which we must consider both " 'the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties.' " *Barreto–Rivera*, 168 F.3d at 46 (quoting

---

6. Puerto Rico is considered a "state" within the meaning of 42 U.S.C. § 1983 and the term "state law" therefore includes Puerto Rico law. *Barreto–Rivera v. Medina–Vargas*, 168 F.3d 42, 45 (1st Cir.1999).

7. The other is that the conduct "worked a denial of rights secured by the Constitution or laws of the United States." *Martinez*, 54 F.3d at 984. Because the district court dismissed the case based solely on the "under color of law" issue, we have no occasion to consider any other aspect of section 1983 liability or possible defenses.

*Martinez,* 54 F.3d at 986–87); *see also Parrilla–Burgos,* 108 F.3d at 449. The determination does not turn on "whether an officer stays strictly within the line of duty, or oversteps it." *Martinez,* 54 F.3d at 986. An officer who abuses or exceeds his recognized authority may be acting under color of law if, "at the time in question, [he] purposes to act in an official capacity or to exercise official responsibilities pursuant to state law." *Id.* Although the subjective reactions of the victim may have some relevance, "the primary focus of the color of law analysis must be on the conduct of the police officer," *Barreto–Rivera,* 168 F.3d at 47, and whether it "related in some meaningful way either to the officer's governmental status or to the performance of his duties," *Martinez,* 54 F.3d at 987.

In both *Martinez* and *Parrilla–Burgos,* the application of these principles led us to uphold district court summary judgment rulings that the plaintiffs had failed to establish that the defendant police officers acted "under color of state law." In *Martinez,* an on-shift police officer accidentally shot and maimed a fellow off-shift officer after repeatedly harassing that officer in the station house. Although he was in uniform and armed with his service revolver, the harassing officer never asserted his authority as a police officer. We concluded that he "was bent on a singularly personal frolic: tormenting an acquaintance. Though on duty and in uniform, [the officer's] status as a police officer simply did not enter into his benighted harassment of his fellow officer," *Martinez,* 54 F.3d at 987 (footnote omitted).

The facts in *Parrilla–Burgos* more closely resemble those before us. In that case, an off-shift police officer using his service revolver fatally shot a fellow bar patron. The officer, who was on medical leave and not in his uniform, had encountered the decedent at the bar, telling him: "I'll look at you whichever way I please, because I am a cop." *See* 108 F.3d at 447. The exchange escalated and the officer

repeated his claim to special status: "I look at anybody I want, because I'm a cop. Anybody I decide I want to look at dirty, I look at them dirty." *See id.* The officer apparently displayed his identification to the crowd gathered around, telling the onlookers that he was there to keep the peace. That statement stopped the fracas briefly, but it soon resumed, and the decedent challenged the officer to step outside without his gun. The officer responded, "I don't need a gun to fight you," but he nevertheless took the gun with him when the two men left the bar. Moments into the fight, the officer pulled out his weapon and fired the six shots that killed the decedent.

We concluded that, despite the officer's comment that he was in the bar to keep peace and his showing of police identification, the officer's conduct demonstrated that he was acting in a private capacity. *See id.* at 450. We observed that statements such as those by the officer claiming a special privilege to "look dirty" at an individual by virtue of his position as a police officer "do not constitute action under color or pretense of state law if the asserted privilege lies clearly outside the scope of their official duties." *Id.* at 451. Weighing heavily in our decision was that the final exchange between the officer and the decedent before they left the bar amounted to an invitation and acceptance to engage in a private brawl, after which the officer made no further pretense of official action. *See Barreto–Rivera,* 168 F.3d at 46; *Parrilla–Burgos,* 108 F.3d at 450–51.

We found the pre-trial evidence less decisive in *Barreto–Rivera.* The episode there began when the defendant officer, driving in his cruiser, followed the decedent as he drove home from a local store. When they reached the house, the officer demanded the decedent's license and registration. A verbal exchange occurred outside the home, during which the decedent accused the officer of making a pass at his wife. The two men exchanged punches

and the officer repeatedly hit the decedent with his night stick before the pair was separated and the decedent went into the house. At that point, two of the decedent's family members approached the officer and were pushed and shoved by him. Seeing the conflict, the decedent came out of the house, picked up a piece of plastic tube from his yard, and approached the officer. Although several witnesses took the tubing from the decedent, the officer radioed for back-up help, stating: "10–50, I have been attacked. Hurry up, this guy is acting tough and I am going to have to shoot him." 168 F.3d at 44. The decedent told the officer to drop his gun and fight with his fists. The officer responded by telling the decedent not to come any closer or he would shoot. The decedent continued to approach, and the officer fatally shot him.

The district court in *Barreto–Rivera* relied on deposition testimony to conclude that the officer's encounter with the decedent stemmed from a "love feud" and that his behavior and the shooting consequently were acts of a personal nature. *See id.* at 47. The district court equated the showdown to the "private brawl" in *Parrilla–Burgos,* observing that the officer's call for back up on his police radio in the final moments of the confrontation—a seemingly official act—might have been designed to set up a claim of self-defense for his plan to shoot the decedent. The court found it significant that the decedent's "actions were 'not the acts of a person heeding another's status as a policeman; instead, they reflect [the decedent's] total disregard for [the officer's] official position.'" *Id.*

On review, however, we held that the facts and possible inferences did not lead inexorably to a finding of private conduct. We discounted the decedent's subjective reactions to the confrontation and noted numerous indicators of official action: the officer was on duty, in uniform, patrolling in his cruiser, and he relied on his authority as a police officer to stop the decedent and demand his license and registration. We further observed that the officer used his nightstick—"a police-issued weapon and a potent symbol of police authority"—against the decedent, that the officer summoned help on his police radio, and ultimately shot and killed the decedent with his service revolver. *Id.* at 48. In such circumstances, we were "unwilling to say that [the officer's] conduct was so clearly personal in nature that a jury could reach only one outcome." *Id.* We therefore vacated the judgment for defendants.

### C. *Applying the Standard*

 In its assessment of the circumstances before us, the district court highlighted testimony that Rolon had "excitedly" joined in the fight, which indicated to the court a desire to participate rather than to establish order. The court also pointed to Rolon's "brutal and random attack of Zambrana ... and his decision to steal his wallet." At the same time, the court downplayed the officers' use of official measures, particularly the handcuffs and search of Zambrana, observing that these techniques were not used for the usual purposes of facilitating an arrest or checking for weapons or contraband. In the court's view, the totality of the circumstances showed that "[m]ore likely than not, their conduct consisted of private violence engaged in by two individuals who happened to work for the state...."

Though we acknowledge that this is one plausible reading of the evidence, we are unpersuaded that it is the only one. We believe that the record contains sufficient indicia of official police action that a jury reviewing the "nature and circumstances" of Suarez and Rolon's conduct and the "relationship of that conduct to the performance of [their] official duties," *see Martinez,* 54 F.3d at 986, could conclude that they acted under color of state law, albeit in clear abuse of their authority.

We begin our discussion of the evidence by noting a significant difference between the circumstances here and those in all

three of the earlier cases discussed above. In *Martinez, Parrilla–Burgos* and *Barreto–Rivera,* the injury and deaths arose out of incidents in which the police officers were original participants. Here, by contrast, Rolon and Suarez entered an already developed dispute between two private individuals, and their action in helping to pull Zambrana and Casablanca apart was consistent with the responsibility of police officers to defuse violent situations. That Rolon's intervention quickly turned brutal and inappropriate does not negate the possibility that this was an official action. Nor does the testimony noted by the district court describing Rolon as "excitedly" entering the fight. The actual testimony did not, in fact, describe Rolon as "excited." Suarez was asked in his deposition whether Rolon became involved "because of the excitement," and he answered "yes." Read in a light most favorable to plaintiffs, Suarez's testimony may simply have indicated that the commotion caused by the fight prompted Rolon to step in.

The evidence contained a number of additional indicators of official action: Rolon's telling onlookers to stay away because he and Suarez were police officers; the use of handcuffs to subdue Zambrana[8]; the search of Zambrana and seizure of cocaine; and a statement by Suarez to a friend of Zambrana's that he planned to pursue drug and possibly other charges against Zambrana.[9] Moreover, unlike in *Parrilla–Burgos,* where the officer's assertion of special status occurred only in the opening minutes of the episode, the indicia of official conduct here spanned the entire interaction, ending with the search and seizure.

Taken together, these circumstances permit a judgment that Suarez and Rolon took control of the Zambrana/Casablanca fight in furtherance of their duty as police officers and for the purpose of ending the disturbance; that they did so in part through Rolon's abuse of his police power and in part through the use of a traditional law enforcement tool, the handcuffs; and that the search of Zambrana was conducted under the apparent authority of the officers' official status. Even if Suarez and Rolon's purpose in searching Zambrana was to steal whatever they could from him, we believe a jury could conclude that their actions were taken under color of law because they were enabled by their status as police officers. As noted earlier, an individual's conduct is attributable to the state not only if it arises from the performance of actual duties but also if it occurs in the course of performing an *apparent* duty of his office, or "is such that the actor could not have behaved in that way but for the authority of his office." *Martinez,* 54 F.3d at 986. *Cf. Stengel v. Belcher,* 522 F.2d 438, 440–41 (6th Cir.1975).[10]

**8.** Although the district court stated that "[t]he context in which the handcuffs were used in this case was not the context typical of a governmental intervention (to facilitate an arrest)," Suarez stated at•one point in his deposition that he was thinking of arresting Zambrana before he handcuffed him. Asked if he restrained Zambrana that way "because you were a policeman who had the authority to handcuff somebody," he answered, "[a]t that moment, yes." He then was asked: "And you had done this because you had observed him doing something that you understood to be illegal conduct?" He answered, "Well, the fight, up to that moment."

At another point in the deposition, however, Suarez stated that, up to the time he handcuffed Zambrana, he had no intention of arresting him and thought about doing so only after the packet of cocaine was found. This direct contradiction must, of course, be viewed in the light most favorable to plaintiffs.

**9.** In his deposition, Suarez reported that he told a friend of Zambrana's that he "was going to call a patrol car in order to submit ... charges for the drug and the fight and consult with the prosecutor." The friend then asked Suarez to let him go "as a favor," and Suarez agreed.

**10.** *Stengel* involved an off-duty police officer who was at a bar with friends when he intervened in a dispute between other patrons. The defendant officer was not in uniform and he did not identify himself as a police officer, but, as required by department regulations, he had with him his service revolver and a can of mace. During the incident, the officer

In sum, we think there was enough here to warrant putting the question to the jury. Indeed, the district court, evidently recognizing that the evidence tipped in both directions, phrased its conclusions in language undermining its conclusion that summary judgment was appropriate; rather than stating that the evidence could lead to but one result, the court observed that "[m]ost probably, Rolon and Suarez's motive was purely criminal in nature," [11] and "[m]ore likely than not," their conduct consisted of private violence. A conclusion that the dispositive fact is more likely than not is inconsistent with the standard for summary judgment.

As in *Barreto–Rivera*, the court appears to have improperly engaged in its own weighing of the evidence, failing to give the plaintiffs the benefit of all inferences to be drawn from the available facts. *See* 168 F.3d at 47. We therefore vacate its entry of summary judgment and remand for further proceedings on plaintiffs' section 1983 claim.

### D. *Pendent Claims*

The district court declined to exercise jurisdiction over plaintiffs' pendent Commonwealth law claims because of its dismissal of the section 1983 claim. In light of our disposition on the federal civil rights claim, we vacate dismissal of the pendent

claims and remand those as well for further attention by the district court.

*Vacated and remanded.*

shot three men, two of whom died and one of whom was paralyzed. The court upheld the jury's verdict for the plaintiff. In discussing whether the officer was acting under color of state law, despite conduct that "overstepped the bounds," the court highlighted two factors: first, that the officer intervened in the dispute pursuant to a duty imposed by police department regulations, and, second, that a city inquiry had concluded that the officer had acted in the line of duty. *See* 522 F.2d at 440–41. Plaintiffs here point to the similar Puerto Rico policy that officers are always on duty, *see* note 1 *supra*, and note that Suarez received State Insurance Fund (SIF) approval for treatment for psychological trauma shortly after the Zambrana incident. Although there appears to be equivalence with *Stengel*

on the duty to intervene, the cases are less similar on the latter point. Not only is the record unclear as to whether Suarez's referral to the SIF was specifically linked to this incident, *see* District Court Opinion at 16, but there is no explicit determination by the police department that the officers' conduct was in the line of duty.

11. A criminal motive would not, of course, necessarily negate a finding that the conduct was under color of state law; the officers could be deemed state actors even when abusing the positions given to them by the state. *See Martinez*, 54 F.3d at 986 (quoting *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)).