Roberto L. MELENDEZ SANTANA, et al., Plaintiffs

v.

PUERTO RICO PORTS AUTHORITY, et al., Defendants.

Civil No. 04–2328 (JP).

United States District Court, D. Puerto Rico.

Jan. 22, 2007.

Rafael A. Oliveras–López, Esq., Caguas, PR, for Plaintiffs.

Martha L. Martínez–Rodríguez, Esq., Manuel A. Núñez Law Office, Francisco A. Ojeda–Diez, Esq., P.R. Department of Justice, Federal Litigation, San Juan, PR, for Defendants.

## OPINION AND ORDER

PIERAS, Senior District Judge.

The Court has before it the defendants' motion for summary judgment. Plaintiff Roberto Meléndez Santana ("Meléndez") is a former employee of defendant Puerto Rico Ports Authority ("PRPA"), and claims the defendants discriminated against him on the basis of disability in violation of the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, and Puerto Rico law. The defendants move for summary judgment on Meléndez's ADA claims on the grounds that no genuine issue exists as to whether the defendants discriminated against Meléndez on the basis of his disability, and as to whether Meléndez is a qualified individual entitled to reasonable accommodation. The defendants' motion for summary judgment (**No.78**) is **GRANTED,** and the Court *sua sponte* dismisses the Title VII claims as a matter of law for failure to state a claim upon which relief may be granted.

## I. STANDARD

■ Summary judgment serves to assess the proof to determine if there is a genuine need for trial. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Zambrana–Marrero v. Suárez–Cruz,* 172 F.3d 122, 125 (1st Cir.1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Canal Ins. Co. v. Benner,* 980 F.2d 23, 25 (1st Cir.1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989).

· In a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Goldman,* 985 F.2d at 1116.

## II. MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE

The following material facts are properly supported, and are not in genuine issue or dispute.

1. Plaintiff Roberto Meléndez began working in the Puerto Rico Ports Authority in 1993 as a Security Supervisor, initially at the Navy Frontier.

2. In 1994, Meléndez was administratively assigned to work as an assistant and bodyguard to Hermán Sulsona, then Executive Director of PRPA, and was on-call seven days a week.

3. After Sulsona's resignation in 1998, Meléndez was transferred to the International Airport as security supervisor.

4. Security Supervisors are assigned to the aviation or maritime division since the Office of General Security was dismantled in 1998 and have rotating shifts.

5. Among the essential duties of Security Supervisors are: inspection of all services rendered by guards and other employees in the security area; periodic inspections of security areas, operational areas, areas in construction; enforcing the security rules and recommending necessary measures; and communicating with different security areas, local police and federal officers. The job requires regular contact with the public, visitors, other employees and the security supervisor must be alert and able to react in emergency situations.

6. In 1997, Meléndez's former wife and mother of two young daughters passed away.

7. In 1998, Meléndez met his current wife, plaintiff Jessica González. They have been married since 1999 and have three children together.

8. On September 11, 2001, the working shifts in the airports changed and everybody was working extended shifts.

9. On February 11, 2002, Meléndez wrote to the Executive Director, then José G. Baquero, requesting a transfer of position due to personal reasons. Specifically, Meléndez expressed that he had two young children who were dependent on him after his mother passed away, and the rotating shifts interfered with his duties as a parent.

10. By the time of said request Meléndez had been married to Jessica González for approximately three years and had had more children with her.

11. On June 7, 2002, PRPA's Executive Director, José G. Baquero, administratively assigned Meléndez to the Maritime Bureau under Manuel Villazan's supervision. The transfer was effective on June 10, 2002.

12. Meléndez got upset because he was transferred to the same position on another division and his physician had ordered him to rest. Meléndez's physician, Dr. Fernández Cuevas, had diagnosed him as having major severe depression with recurrent anxiety, panic attacks and tendencies to become aggressive, and ordered him to rest because he was unable to work.

13. Meléndez brought a medical certificate wherein his Dr. Fernández Cuevas certified that he was unable to work beginning July 1, 2002 due to depression and anxiety that limited his concentration and made him unstable.

14. Meléndez retained the services of Hector Hernández–Nazario and applied for Social Security benefits on September 23, 2002, due to a disability.

15. Meléndez claimed to the Social Security Administration that he was totally disable and unable to perform work since June 12, 2002.

16. Meléndez's application for Social Security Benefits was denied initially. He requested reconsideration on December 11, 2002, and a hearing on February 12, 2003.

17. From June 17, 2002 to April 28, 2003, Meléndez produced to the PRPA medical certificates wherein his doctors certified that he was unable to perform any labor activity. Thus Meléndez remained on leave of absence for almost a year.

18. On Monday May 5, 2003, Meléndez reported back to Puerto Rico Ports Authority, specifically to the Maritime Division, where he had been designated by the Executive Director in June 2002, prior to his leave of absence.

19. Meléndez brought that day a medical certificate from Dr. Octavio Ramírez, a family doctor, dated May 1, 2003. The certificate stated Meléndez could not work on rotating shifts, and could not work in security.

20. Since 1995, PRPA had established a procedure for the proper handling of Reasonable Accommodation Requests. In accordance with that procedure, Meléndez was immediately referred on May 5, 2003, to PRPA's Industrial Security Office that was in charge of administering the reasonable accommodation program.

21. After receiving a complete orientation of the procedure from Reinaldo Vazquez, Industrial Security Inspector, Meléndez requested a reasonable accommodation.

22. The following day, May 6, 2003, Meléndez was referred for medical evaluation to determine whether he was qualified for a reasonable accommodation.

23. Upon PRPA'S referral, Meléndez was evaluated first by Dr. Orlando Vallejo and Leonel Shub of HMC Medical Services on May 6, 2003. After the initial evaluation, he was referred to Dr. Andrés López Cumpiano, a psychiatric consultant for another evaluation.

24. Vázquez met with Ralph Otero, Director of Security and Villazan, Head of the Maritime Division where Meléndez was assigned. They considered a provisional arrangement until Meléndez medical evaluation was completed, a study of available positions was conducted and a decision on his application for reasonable accommodation was taken with all the elements required for said decision.

25. Meléndez was temporarily placed as a Safety Supervisor at PRPA's main office until the evaluation of his application for reasonable accommodation was completed.

26. Dr. Andrés López Cumpiano, the Psychiatrist recommended by HMC Medical Services, evaluated Meléndez on May 14, 2003 to determine if he could qualify for a reasonable accommodation and the alternatives according to his condition. Dr. López Cumpiano concluded that Meléndez was not able to perform any task with or without reasonable accommodation and that he should remain in treatment for a few months, and then be re-evaluated. His report was notified to PRPA on June 3, 2003 as part of HMC Medical Services Report.

27. Once a medical evaluation is received at PRPA, it is referred to the Industrial Security Office for evaluation and recommendations to the Executive Director, who is the officer

authorized to grant, deny or modify reasonable accommodations.

28. Meléndez submitted Dr. López Cumpiano's report to the Social Security Administration and it was made part of his file.

29. Meléndez got upset and offended so he accused Villazan of mistreating him and violating his reasonable accommodation allegedly granted by the agency.

30. Meléndez called his wife to pick him up at PRPA because he was emotionally affected.

31. Meléndez reported to the State Insurance Fund on June 2, 2003, after the incident. The State Insurance Fund dismissed the case, and Meléndez appealed.

32. Meléndez never reported back to work at PRPA after June 2, 2003.

33. On July 14, 2003, after evaluating all documents submitted by Meléndez since August 23, 2002, the Social Security Administration issued its final decision concluding that Meléndez was disabled since June 12, 2002 and not capable of performing any type of work.

34. The Social Security Administration's determined the following:

a. The claimant's impairments prevent him from carrying out even simple instructions on a sustained basis, responding adequately to co-workers, supervision and usual work situations, concentrating and making judgments that are commensurate with the functions of unskilled work, comply with production schedules and quotas and tolerating even low levels of stress found in simple unskilled types of work.

35. The Social Security Administration concluded that due to his disability Meléndez was not only unable to perform the duties of his position, but actually of any other job.

36. On November 10, 2003, Meléndez filed a Complaint with the EEOC claiming that PRPA failed to reasonably accommodate him.

37. On December 1, 2004, Meléndez filed the above captioned complaint claiming that he was discriminated based on his disability.

38. To this date, Meléndez continues to receive Social Security benefits due to his disability.

## III. ANALYSIS

### A. ADA Claim

The Americans with Disabilities Act ("ADA") prohibits employment discrimination against qualified individuals with disabilities who can perform the essential functions of a job with or without reasonable accommodation. *See* 42 U.S.C. § 12112(a). To establish a claim of disability discrimination under the ADA, a plaintiff must demonstrate (1) that he is "disabled" within the meaning of the ADA; (2) that with or without reasonable accommodation, he could perform the essential functions of the job; and (3) that the employer took an adverse employment action with respect to the plaintiff in whole or in part because of the disability. *See Vélez Del Valle v. Mobile Paints*, 349 F.Supp.2d 219, 226 (D.P.R.2004) (Pieras, J.), *citing Jacques v. Clean–Up Group, Inc.*, 96 F.3d 506, 511 (1st Cir.1996). A plaintiff may also indirectly prove his case by using the *prima facie* case and burden shifting methods that originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Katz v. City Metal Co., Inc.*, 87 F.3d 26, 30 n. 2 (1st Cir.1996) (citations omitted); *see also EEOC v. Amego, Inc.*, 110 F.3d 135, 145 n.

7 (1st Cir.1997) (recognizing that the ADA is interpreted in a manner similar to Title VII).

The defendants argue that Meléndez cannot meet the second prong of the *prima facie* test. The Court agrees. The second prong of the *prima facie* case under the ADA requires that a plaintiff prove that he could perform the essential functions of his job with or without reasonable accommodation. *See Vélez Del Valle,* 349 F.Supp.2d 219, 226. The record shows that at the time of the alleged discrimination, Meléndez was receiving disability benefits from the Social Security Administration. The Supreme Court held that where an ADA plaintiff previously applied for and received disability benefits, the plaintiff must "proffer a sufficient explanation" for the contradicting claims. *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). The explanation must be sufficient to permit a reasonable juror to conclude, assuming the truth of, or the plaintiff's good faith belief in, the earlier sworn claim of total disability, the plaintiff nonetheless could perform the essential functions of his job with or without reasonable accommodation. *Id.* at 807.

It is abundantly clear from the record before the Court that Meléndez cannot meet this requirement, because he was rendered completely disabled by his conditions. Meléndez was diagnosed as having major severe depression with recurrent anxiety, panic attacks, and tendencies to become aggressive. In July of 2002, Meléndez stopped working at the PRPA due to these conditions. In September of that year, he applied for Social Security disability benefits, claiming that he was totally disabled and unable to work. He produced additional medical certificates declaring his total disability to the PRPA to document his need to remain on a leave of absence through April of 2003. There is no indication on the record that the plaintiff's psychiatric conditions changed by June 2, 2003 when the alleged ADA violations occurred. The plaintiff failed to proffer a sufficient explanation for the discrepancy between his claim for Social Security benefits for total disability, and his claim that he could perform the essential functions of his job with reasonable accommodation. Because no genuine issue exists as to whether Meléndez was totally disabled, the Court will enter judgment dismissing the ADA claim with prejudice.

**B. Title VII Claim**

The Court recognizes that no party has filed a motion to dismiss the Title VII claim against PRPA in this case. However, *sua sponte* dismissal for failure to state a claim is warranted where "it is crystal clear that the plaintiff cannot prevail and that amending the complaint would be futile." *See Chute v. Walker,* 281 F.3d 314, 319 (1st Cir.2002), *citing González–Gonzalez v. United States,* 257 F.3d 31, 37 (1st Cir.2001). In the instant case, the material facts are crystal clear and no amendment of the complaint could possibly serve to alter the Court's disposition of Meléndez's claims. Meléndez claims the defendants discriminated against him only on the basis of his disability. Title VII of the Civil Rights act of 1964 bars only discrimination on the basis of race, color, religion, sex, and national origin. 42 U.S.C. § 2000e–2(a). Accordingly, the Court will enter judgment dismissing the Title VII claim with prejudice.

**C. Claims under Puerto Rico law**

The Court declines to continue to exercise supplemental jurisdiction over the claims arising under the Puerto Rico law,

and will enter judgment dismissing those claims without prejudice.

**IT IS SO ORDERED.**