Emilia VILLEGAS–REYES, Plaintiff

v.

UNIVERSIDAD INTERAMERICANA
DE P.R., Defendant.

No. 104.
Civil No. 05–1997(JP).

United States District Court,
D. Puerto Rico.

Feb. 16, 2007.

Aníbal Escanellas–Rivera, Esq., Escanellas & Juan, San Juan, PR, for Plaintiff.

Amancio Arias–Guardiola, Esq., Arias Cestero & Arias Guardiola, Lorraine Juarbe–Santos, Esq., Interamerican Uni-

versity of Puerto Rico, San Juan, PR, for Defendant.

## OPINION AND ORDER

PIERAS, Senior District Judge.

The Court has before it the defendant's motion for summary judgment, and the plaintiff's opposition. This action is brought under the Age Discrimination in Employment Act ("ADEA"), under Title VII of the Civil Rights Act of 1964, and for violations of Puerto Rico law. Plaintiff Emilia Villegas Reyes alleges she is fifty-one years old, and worked for defendant Interamerican University of Puerto Rico ("IAU") from May 17, 1987 until she was terminated on February 24, 2005. She claims the defendant discriminated against her on the basis of her age, and retaliated against her for filing discrimination charges with the Anti-discrimination Unit of the Puerto Rico Department of Labor, and the EEOC. The defendant moves for summary judgment on the ADEA claims on the grounds that there is no evidence on the record of age discrimination, or retaliation. The Court **GRANTS** the defendant's motion for summary judgment **(No. 35)**, and dismisses the Title VII claims as a matter of law for failure to state a claim.

## I. STANDARD

Summary judgment serves to assess the proof to determine if there is a genuine need for trial. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see*

*also Zambrana–Marrero v. Suárez–Cruz,* 172 F.3d 122, 125 (1st Cir.1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Canal Ins. Co. v. Benner,* 980 F.2d 23, 25 (1st Cir.1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989).

In a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Goldman,* 985 F.2d at 1116.

## II. MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE

The following material facts are properly supported, and are not in genuine issue or dispute.

1. Defendant IAU is a private educational institution.

2. As all other educational institutions whose students may qualify for federal aid programs for the payment of tuition and other covered expenses, IAU's operations are audited for compliance purposes, by both internal and external auditors. The external auditors include federal officers.

3. Plaintiff Emilia Villegas was born on May 28, 1953.

4. On May 17, 1987, Villegas became a full-time employee of IAU. At that time, Villegas occupied a *Typing Clerk* position at IAU's Law School, Financial Aid Office.

5. By May 17, 1987, Villegas received five or six years of experience in student financial aid matters.

6. In January 1988, Villegas was appointed to the position of *Administrative Assistant* assigned to IAU's Study and Work Program. Villegas was transferred to IAU's Metropolitan Campus.

7. In mid–1988, there was an opening for an *Official* position in IAU's Metropolitan Campus, Students' Financial Aid Office. Villegas was appointed to this position which she occupied for several years.

8. Thereafter, Villegas was reclassified to the position of *Official II*.

9. While employed with IAU, Villegas reported to the State Insurance Fund ("SIF") on several occasions.

10. Specifically, Villegas first reported to the SIF in 1990. At said time, she reported to the SIF following an accident in which she fell from a chair. The SIF did not place Villegas on leave of absence in connection with the referenced accident.

11. In 1994, Villegas reported to the SIF following an accident in which she suffered a fall in a stairway. As a result of this accident, the SIF placed Villegas on a fifteen-day leave of absence. IAU granted Villegas the leave of absence. Following said leave, Villegas reported back to work without any restrictions. Accordingly, Villegas was allowed to continue performing her regular duties with IAU.

12. In 1995, Villegas reported once again to the SIF, this time because of problems with her vision. Villegas was told by the SIF that her problem was age-related, and accordingly her case was closed by the SIF. The SIF did not place Villegas on a leave of absence in connection with this condition.

13. In 1996, Villegas reported to the SIF due to pain in the cervical and lower back regions. The SIF provided Villegas with medication and physical therapies, but did not place Villegas on a leave of absence in connection with these conditions. The SIF determined that the referenced conditions were not work-related.

14. In 2001, Villegas reported to the SIF due to pain in the cervical, dorsal and shoulder areas. The SIF provided Villegas with physical therapies and medication, but did not place Villegas on a leave of absence in connection with these conditions. She received her physical therapies while performing her regular duties.

15. Villegas' job as *Official* assigned to the Financial Aid Office included the following essential duties:

a. determining the students' eligibility for financial aid;

b. conducting the reimbursement process when students processed official and non official drops;

c. revising and analyzing financial aid files for accuracy and compliance purposes;

d. verifying information to determine financial aid eligibility time period;

e. checking facts contained in the Financial Aid Requests to the Federal Government;

f. processing different transactions in connection with different types of financial aids;

g. transmitting federal financial assistance requests;

h. paying federal loans;

i. processing the Study and Work payrolls;

j. entering information on the proper forms for FWSP payrolls and processing payment;

k. assigning students to Study and Work programs;

l. processing financial aid transcripts at the request of other institutions;

m. revising lists submitted by the Central System Office;

n. preparing the files for the Central Collections and Loans Office, and

o. carrying out other duties assigned by the person's supervisor.

16. In 2002, Villegas reported to Glenda Díaz ("Díaz"), who occupied the position of Financial Director. Villegas considered Díaz to be a strict supervisor.

17. Villegas was authorized to teach a two-credit course during the time period from January to March 2003.

18. On August 13, 2003, Díaz issued a letter, which stated that during the months of June and July 2003, Villegas had two students placed in the IAU's Study and Work Program, though they were ineligible for the program.

19. In her August 13, 2003 letter, Díaz stated that after the mistake was discovered, Villegas was instructed to verify the Institutional Student Information Records for the years 2003–2004, as well as the Banner System to detect any additional mistakes.

20. Villegas failed to conduct the review, and another employee identified two cases where the student's files contained outdated immigration documentation.

21. Due to Villegas' mistakes assigning ineligible students to the Work and Study Program, IAU had to repay the amounts at issue through institutional funds.

22. In August 2003, Villegas reported to the SIF, after receiving a one-month suspension from work.

23. On August 29, 2003, Claudio Prieto, Chancellor of IAU, issued Villegas a letter in which he stated she was suspended from employment for one month beginning September 1, 2003, because she entered Díaz's office on August 16, 2003 without authorization.

24. In Díaz's opinion, Villegas' actions constituted an invasion of her privacy, insubordination, and unethical behavior. In a letter dated August 19, 2003, Díaz expressed to Deal Elsa Magaly González ("González") her concern about Villegas' actions, and about Villegas' work on federal matters.

25. On August 16, 2003, Villegas physically removed files from Díaz's office to examine them.

26. IAU conducted an investigation before suspending Villegas.

27. Díaz advised Villegas that the Chancellor made the decision to suspend her.

28. As part of the investigation IAU interviewed and took written statements from employees who attended work on August 16, 2003.

29. In November 2004, Tiana V. Rodríguez, a student in IAU's Study and Work Program, complained about how

Villegas handled the payment of her October 2004 salary. On November 15, 2004, Rodríguez prepared a written statement of the events. On November 16, 2004, Rodríguez visited Díaz's office and requested an urgent meeting with Díaz to discuss the matter.

30. Díaz gave Villegas the opportunity to present her version of Rodríguez's case. To Díaz's surprise, Villegas provided her with a version of the facts that was different from the one she had previously given.

31. Díaz requested that Villegas prepare a written explanation of the matter. Díaz finished her conversation with Villegas under the impression that the two of them had reached an agreement as to the corrective actions to be taken in connection with Rodríguez's complaint.

32. On November 16, 2004 at 2:30 p.m., Díaz observed when Villegas left work without completing her working hours. Díaz asked Villegas' co-workers why Villegas had left work early.

33. Díaz requested an institutional grant to cover the payment of Rodríguez's salary.

34. Villegas did not comply with Díaz's request.

35. On November 18, 2004, Villegas reported back to work. On that date, Díaz and Sub–Director Aida Reyes ("Reyes") met with Villegas to discuss her abandonment of her work on November 16, 2004. The meeting took place at Díaz's office.

36. Villegas was given a written warning, which she refused to sign.

37. Villegas abruptly left the meeting, which was considered to be yet another instance of insubordination on her part.

38. Villegas went to Marilina Wayland's office and complained about Díaz and the disciplinary memorandum she had just received. Wayland was the Chancellor of IAU.

39. Wayland met with her for about half an hour and provided her with an opportunity to express her version of the events as well as her complaints against Díaz. Villegas believed Wayland treated her nicely during the meeting.

40. Wayland advised Villegas she would investigate Villegas' allegations.

41. From November 16, 2004 to February 2005, Villegas took a leave of absence.

42. From November 22, 2004 to December 2, 2004, Villegas was hospitalized at San Juan de Capestrano. She then had ten partial hospitalizations at that institution.

43. Following the completion of her partial hospitalization program, Villegas reported to the SIF in connection with a physical condition.

44. Villegas did not work during the January 2005 enrollment period.

45. From February 22 to February 24, 2005, Villegas performed her normal duties at IAU.

46. In February 2005, Villegas was called into González's office. At that time, González tendered her a letter from Wayland confirming the disciplinary action IAU implemented in connection with the November 16, 2004 incident and advising Villegas that her employment would be terminated effective February 24, 2005.

47. Wayland alone made the decision to terminate Villegas. Wayland decided to terminate Villegas, because of her investigation of the November 16, 2004 incident and Villegas' failure to respond to discipline.

48. On September 4, 2004, Villegas filed her original charge before the ADU, in which Villegas claimed that the disability discrimination had occurred on August 29, 2003 when she was given a one month suspension from work.

49. On February 15, 2005, Villegas filed an amended charge before the ADU and Equal Employment Opportunity Commission ("EEOC"), in which she alleged Díaz harassed her on the basis of age.

50. EEOC investigator Carlos González conducted an investigation of Villegas' charges. On July 12, 2005, the EEOC issued its *Dismissal and Notice of Rights* document. The EEOC clarified that it was closing its file on plaintiff's charge because, "[b]ased on the Investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."

51. While employed with IAU, Villegas received annual salary increases.

52. Villegas bases her age discrimination claim on the fact that at the time of her termination she was in the protected age group and on alleged discriminatory comments from Díaz.

## III. ANALYSIS

### A. ADEA Claims

■ Under the ADEA, 29 U.S.C. §§ 621 et seq., "it is unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To establish a *prima facie* case of age discrimination, a plaintiff must demonstrate (1) she is at least forty years old, (2) her job performance met the employer's legitimate expectations, (3) the

employer subjected her to an adverse employment action, and (4) the employer had a continuing need for the services provided by the position. *Hoffman v. Applicators Sales and Service, Inc.*, 439 F.3d 9, 17 (1st Cir.2006). The *prima facie* showing creates a rebuttable presumption that the defendant-employer violated the ADEA. *Id.* at 17. The burden of production shifts to the defendant-employer to articulate "a legitimate, nondiscriminatory basis for its adverse employment action." *Id.* at 17. If the employer meets this burden, then the plaintiff must demonstrate that the employer's articulated reason is mere pretext for discriminatory animus.

■ Villegas bases her ADEA claim against IAU on two alleged adverse employment actions, her termination on February 24, 2005, and a hostile work environment resulting from Díaz's age-based harassment. IAU is entitled to summary judgment on Villegas' claims of age discrimination arising out of her termination. Even if the plaintiff were to establish a *prima facie* case of age discrimination with respect to her termination, IAU has argued that Villegas was terminated due to performance deficiencies, and Villegas has produced no evidence indicating that these articulated reasons are mere pretext for age discrimination. IAU provided the sworn statement of its Chancellor, who declared that she alone made the decision to terminate Villegas' employment, and that the sole factors considered were Villegas' disciplinary record, the nature of the violations she committed, and her failure to respond to progressive discipline. In opposition to these facts, Villegas only produced her affidavit, which details some age-based comments made by Díaz. These comments do not speak to discriminatory animus by IAU with respect to the termination because there is no indication on the record that Díaz participated in the

decision to fire Villegas. Because Villegas failed to produce evidence that would permit a reasonable jury to find her termination was due to age discrimination, IAU is entitled to summary judgment on discrimination claims arising out of her termination.

■ Villegas' also claims the IAU violated the ADEA by creating a hostile work environment. The First Circuit has recognized hostile work environment claims under the ADEA. *See Rivera–Rodríguez v. Frito Lay Snacks Caribbean, a Division of Pepsico P.R.*, 265 F.3d 15, 24 (1st Cir. 2001). To prove a hostile work environment claim, a plaintiff must provide sufficient evidence from which a reasonable jury could conclude that the offensive conduct "is severe and pervasive enough to create an objectively hostile or abusive work environment and is subjectively perceived by the victim as abusive." *Id.* at 24. The plaintiff must demonstrate that the conduct at issue was "so severe or pervasive that it altered the terms of her employment." *Carmona–Rivera v. P.R.*, 464 F.3d 14, 19 (1st Cir.2006). The Court must evaluate the record, considering "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Id.* at 19. The First Circuit held that "rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim." *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir.2005).

■ Villegas' hostile work environment claim fails, because she did not meet her burden to produce evidence of conduct sufficiently severe or pervasive to permit a reasonable jury to find a hostile work environment. Villegas bases her hostile work environment claim on comments Díaz made regarding her age. She declared in her affidavit that Díaz would refer to Villegas as "vieja," "anciana," and "abuela," and otherwise told Villegas that she was old and should retire. Villegas declared Díaz would provide training to younger coworkers and not Villegas. Villegas declared that such behavior was "constant" and "on a daily basis." Even accepting as true that the declared frequency of the conduct, the alleged conduct is too mild to form the basis of a hostile work environment claim. There is no indication the conduct was, either objectively or subjectively, physically threatening, humiliating, nor that it interfered with Villegas' work performance. Because there is no genuine issue as to the presence of a hostile work environment, IAU is entitled to summary judgment on Villegas' ADEA claim arising out of an alleged hostile work environment.

■ Finally, Villegas claims IAU fired her in retaliation for filing charges with the EEOC and ADU. In addition to prohibiting age discrimination, the ADEA protects individuals who invoke the statute's protections. *See* 29 U.S.C. § 623(d) ("It shall be unlawful for an employer to discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful by this section, or ... made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."). Where there is no direct evidence of retaliation, the analysis of a claim under Section 623(d) closely tracks the *McDonnell Douglas* framework. The plaintiff must make a *prima facie* showing (1) she engaged in ADEA protected conduct, (2) she was thereafter subjected to an adverse employment action, and (3) a causal connection existed between the protected conduct and the adverse action. *Ramírez Rodríguez v. Boehringer Ingelheim Pharmaceuticals*, 425 F.3d 67, 84 (1st Cir.2005). If the plaintiff makes this

*prima facie* showing of retaliation, the burden shifts to the defendant to articulate a legitimate non-retaliatory reason for its employment decision. *Id.* at 84. If the defendant articulate such a reason, the plaintiff must show that the employer's proffered reason is mere pretext for retaliation. *Id.* at 84.

█ Villegas' ADEA claim of retaliation fails in the same manner as her discrimination claim arising out of her termination. IAU argued she was terminated due to her performance deficiencies, and Villegas failed to produce any record evidence that these articulated reasons for her termination are pretext for retaliation. Standing alone, temporal proximity between a discrimination charge and the adverse employment decision is not sufficient to permit a reasonable jury to infer the employment decision was made in retaliation. *See Id.* at 85. Accordingly, IAU is entitled to summary judgment on the ADEA retaliation claim.

### B. Title VII

█ The Court recognizes that no party has filed a motion to dismiss the Title VII claim against the IAU in this case. However, *sua sponte* dismissal for failure to state a claim is warranted where "it is crystal clear that the plaintiff cannot prevail and that amending the complaint would be futile." *See Chute v. Walker,* 281 F.3d 314, 319 (1st Cir.2002), *citing González-Gonzalez v. United States,* 257 F.3d 31, 37 (1st Cir.2001). In the instant case, the material facts are crystal clear and no amendment of the complaint could possibly serve to alter the Court's disposition of Villegas' claims. Villegas claims the defendants discriminated against her only on the basis of her age and disabilities. Title VII of the Civil Rights Act of 1964 bars only discrimination on the basis of race, color, religion, sex, and national origin. 42 U.S.C. § 2000e–2(a). Accordingly, the Court will enter judgment dismissing the Title VII claims with prejudice.

### C. Claims under Puerto Rico law

The Court declines to continue to exercise supplemental jurisdiction over the claims arising under the Puerto Rico law, and will enter judgment dismissing those claims without prejudice.

## IV. CONCLUSION

The Court grants the defendant's motion for summary judgment, and dismisses *sua sponte* all claims alleged under Title VII. The Court will enter judgment dismissing the ADEA and Title VII claims with prejudice, and the claims arising under Puerto Rico law without prejudice.

**IT IS SO ORDERED.**